UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| REBECCA COUSINEAU, individually on her own behalf and on behalf of all others similarly situated, | ) ) ) | No. 11-cv-01438-JCC |
| | ) ) | DECLARATION OF STEPHEN M. RUMMAGE IN |
| Plaintiff, | ) ) ) | OPPOSITION TO MOTION FOR CLASS CERTIFICATION |
| v. | ) ) | |
| MICROSOFT CORPORATION, a Delaware corporation, | ) ) ) | *Note on Motion Calendar:* November 8, 2013 |
| Defendant. | ) ) ) | **Oral Argument Requested** |

Stephen M. Rummage declares as follows:

1.     ***Identity of declarant.***  I am a partner in the law firm of Davis Wright Tremaine LLP.  I am one of counsel of record for defendant Microsoft Corporation in this matter.  I make this Declaration based on my personal knowledge for the purpose of authenticating the documents and deposition excerpts attached to this Declaration.

2.     ***Update to Privacy Statement.***  On September 27, 2011, Microsoft posted a revision to the Privacy Statement on the Windows Phone website, consisting of an **IMPORTANT NOTICE** posted at the top of the Privacy Statement.  I am attaching a true and correct copy of the revision to the Privacy Statement as Exhibit 1 to this Declaration.  I have personal knowledge of the creation and posting of the **IMPORTANT NOTICE** at the top of this revision because I

RUMMAGE DECL. IN OPP. TO MOTION
FOR CLASS CERTIFICATION (No. 11-cv-01438-JCC) — 1
DWT 22717431v1 0025936-001471

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

participated in drafting it and confirmed its posting by visiting the website on September 27, 2011. (In addition, I emailed a draft of the text of the **IMPORTANT NOTICE** to Ms. Cousineau's counsel, Jay Edelson, on September 26, 2011, and I notified Mr. Edelson by email on the morning of September 27, 2011, that the update was "going live.")  In that **IMPORTANT NOTICE**, Microsoft described "unexpected behavior" related to the transmission of location information when using the Camera application in Windows Phone 7.  The **IMPORTANT NOTICE** reminded users they could "always disable all access to location information by applications and collection of location information by the Windows Phone location service at any time by going to **Settings > Location** and toggling the location switch to **OFF**."  Finally, the **IMPORTANT NOTICE** told Windows Phone users "[t]he Windows Phone 7.5 update eliminates this unintended behavior by the Camera application."  (Exhibit 1 is the working version of the updated Privacy Statement, from Microsoft's records.   Because the Windows Phone website has been updated since September 27, 2011, the website does not currently show the text as it appeared on the web at that time—although it still shows an **IMPORTANT NOTICE** with similar text.  *See* http://www.windowsphone.com/en-US/legal/wp7/windows-phone-privacy-statement.   I am therefore attaching as Exhibit 2 two pages I downloaded from the Internet Archive website on September 30, 2013, showing how the **IMPORTANT NOTICE** appeared on October 2, 2011. The depiction in Exhibit 2 is consistent with my recollection of the posting.)

   3.     ***Rebecca Cousineau's Discovery Responses.***  On December 17, 2012, Ms. Cousineau served (via email) Answers to Microsoft's First Interrogatories.  I am attaching as Exhibit 3 a true and correct copy of the first and last pages of Ms. Cousineau's Answers to Defendant's First Interrogatories, along with her Answers to Interrogatory Nos. 5 and 6.

   4.     ***Adam Lydick Deposition.***  On April 26, 2013, I defended a Rule 30(b)(6) deposition at which Adam Lydick testified on behalf of Microsoft.  The deposition was taken by counsel for Ms. Cousineau in Bellevue, Washington.  I am attaching as Exhibit 4 true and correct copies of excerpts from Mr. Lydick's testimony.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

5. ***Cristina del Amo Casado deposition.*** On April 24, 2013, I defended a Rule 30(b)(6) deposition at which Christina del Amo Casado testified on behalf of Microsoft. The deposition was taken by counsel for Ms. Cousineau in Bellevue, Washington. Ms. Cousineau's lawyers attached excerpts of Ms. del Amo Casado's deposition in support of their motion for class certification but did not attach Ms. del Amo Casado's correction sheet. Because Ms. del Amo Casado is a native of Spain, she made extensive corrections necessitated by errors in transcription. I am therefore attaching as Exhibit 5 a true and correct copy of the correction sheet for Ms. del Amo Casado's Rule 30(b)(6) deposition. Although some of these corrections refer to pages filed with the Court under seal, no confidential information can be discerned from the corrections alone.

6. ***Sandeep Deo Deposition.*** On April 25, 2013, I defended a Rule 30(b)(6) deposition at which Sandeep Deo testified on behalf of Microsoft. The deposition was taken by counsel for Ms. Cousineau in Bellevue, Washington. I am attaching as Exhibit 6 true and correct copies of excerpts from Mr. Deo's testimony.

7. ***Sameer Dua Deposition (3/13).*** On March 13, 2013, I took the deposition of Sameer Dua in Chicago, Illinois. (Mr. Dua was formerly a plaintiff in this case.) I am attaching as Exhibit 7 true and correct copies of excerpts from Mr. Dua's testimony on March 13, 2013. (Our brief cites these excerpts in the form "Dua Dep. (3/13).")

8. ***Sameer Dua Deposition (8/1).*** On August 1, 2013, I continued the deposition of Mr. Dua. Mr. Dua was located, along with the court reporter and Ms. Cousineau's counsel, in his office in Lansing, Michigan; I participated by telephone from Seattle. I am attaching as Exhibit 8 true and correct copies of excerpts from Mr. Dua's testimony on August 1, 2013. (Our brief cites these excerpts in the form "Dua Dep. (8/1).")

9. ***Rebecca Cousineau Deposition (3/13).*** On March 13, 2013, I took the deposition of plaintiff Rebecca Cousineau in Chicago, Illinois. I am attaching as Exhibit 9 true and correct copies of excerpts from Ms. Cousineau's testimony on March 13, 2013. (Our brief cites these excerpts in the form "Cousineau Dep. (3/13).") The last three pages of Exhibit 9 include Exhibit 5 to Ms. Cousineau's deposition, to which the excerpted transcript pages refer.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

10. ***Rebecca Cousineau Deposition (8/1).*** On August 1, 2013, I continued the deposition of Ms. Cousineau. Ms. Cousineau was in the office of her employer, Sameer Dua, in Lansing, Michigan, along with the court reporter and her counsel; I participated by telephone from Seattle. I am attaching as Exhibit 10 true and correct copies of excerpts from Ms. Cousineau's testimony on August 1, 2103. (Our brief cites these excerpts in the form "Cousineau Dep. (8/1).")

11. ***Craig Snead Deposition.*** On August 22, 2013, I took the deposition of Craig Snead, one of Ms. Cousineau's expert witnesses, in Chicago, Illinois. I am attaching as Exhibit 11 true and correct copies of excerpts from Mr. Snead's testimony.

12. ***Nathanial Good Deposition.*** On August 28, 2013, I took the deposition of Dr. Nathanial Good. Dr. Good was in my firm's office in San Francisco, California, along with one of Ms. Cousineau's counsel and the court reporter; I participated by telephone from Seattle. I am attaching as Exhibit 12 a true and correct copy of excerpts from Dr. Good's testimony.

13. ***Dialogue on Revised Class Definition.*** In late July 2013, I exchanged several emails with Ben Thomassen, one of Ms. Cousineau's counsel, on the subject of a revision to the definition of Ms. Cousineau's proposed class. I am attaching as Exhibit 13 a copy of our emails, the last of which confirms a telephone conversation in which Mr. Thomassen relayed the proposed revised class definition. I told Mr. Thomassen Microsoft would not object to the revised proposed class definition on the ground it departed from the definition in the Third Amended Complaint. Mr. Thomassen and I did not discuss any other proposed amendment to the Third Amended Complaint or to the claims being pursued by Ms. Cousineau.

14. ***Subsequent History of CE Design Litigation.*** Ms. Cousineau's class certification motion cites *CE Design v. Beaty Const. Inc.* 2009 WL 192481 (N.D. Ill. 2009), as illustrative of cases in which "courts have permitted putative class members to self-identify through sworn affidavits." Mot. 9:24-25 & n.12. I am attaching as Exhibit 14 a true and correct copy of two documents downloaded from the ECF system for the Northern District of Illinois, showing the subsequent history of that case. The first four pages of Exhibit 14 consist of the Plaintiff's Agreed Motion for Decertification of Certified Class and Dismissal of Plaintiff's Individual Claims

RUMMAGE DECL. IN OPP. TO MOTION
FOR CLASS CERTIFICATION (No. 11-cv-01438-JCC) — 4
DWT 22717431v1 0025936-001471

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

Pursuant to Settlement Agreement of the Parties, which recites the history of *CE Design* after entry of the Order on which Ms. Cousineau relies. The last page of Exhibit 14 is the Court's Order granting the agreed motion and dismissing the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of October, 2013, at Seattle, Washington.

*/s/ Stephen M. Rummage*
Stephen M. Rummage

RUMMAGE DECL. IN OPP. TO MOTION
FOR CLASS CERTIFICATION (No. 11-cv-01438-JCC) — 5
DWT 22717431v1 0025936-001471

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2013, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record who receive CM/ECF notification, and that the remaining parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

DATED this 7th day of October, 2013.

DAVIS WRIGHT TREMAINE LLP
*Attorneys for Microsoft Corporation*

By *s/ Stephen M. Rummage*
Stephen M. Rummage, WSBA #11168
1201 Third Avenue, Suite 2200
Seattle, Washington  98101-3045
Telephone:  (206) 757-8136
Fax:  (206) 757-7700
E-mail:  steverummage@dwt.com

RUMMAGE DECL. IN OPP. TO MOTION
FOR CLASS CERTIFICATION (No. 11-cv-01438-JCC) — 6
DWT 22717431v1 0025936-001471

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

# EXHIBIT 1

Windows Phone 7 Privacy Statementkeywordswindows phone, wp7, privacy, legaldescriptionRead the Windows Phone 7 Privacy Statement here. Windows® Phone 7 Privacy StatementLast updated: September 2011<img src="/global/windowsphone/renderingassets/Common/warning.png"> <b>IMPORTANT NOTICE</b>

This notice describes unintended behavior in the Windows Phone software involving location services, explains how Microsoft is eliminating that behavior, and reminds you that you can prevent access to location information if you choose to do so.

As described in the Location Services section of this Privacy Statement, the location information stored and used by the Windows Phone location service is limited information about nearby Wi-Fi access points and cell towers that we use to help provide you with location services more efficiently and effectively. It does not include any information that identifies you or uniquely identifies your device and does not allow Microsoft to track you or your device.

We have identified an unintended behavior in the Windows Phone 7 software that results in information about nearby Wi-Fi access points and cell towers being periodically sent to Microsoft when using the Camera application, and, for phones that are configured for US-English, when using the phone's voice command features (such as "Find Pizza"). For the Camera, the software bug results in the behavior even where you have disabled geo-tagging photos in the Camera application.

The Windows Phone 7.5 update eliminates this unintended behavior by the Camera application and voice command feature. After the update, information about nearby Wi-Fi access points and cell towers will be sent when using the Camera application only if you have agreed to tag your photos with location. For voice commands, location information will no longer be requested and information about nearby Wi-Fi access points and cell towers will not be sent to Microsoft when using voice commands.

We also have identified that the Windows Phone 7.5 update contains an unintended behavior when using the "Me" feature in the People Hub. Each time you access the "Me" feature, information about nearby Wi-Fi access points and cell towers is sent to the Windows Phone location service. The information sent, received and stored by the Windows Phone location service when you use the "Me" feature does not identify you or your individual device. Nevertheless, this behavior is unintended and will be eliminated as part of the next scheduled update to Windows Phone 7.5. After that update, information about nearby Wi-Fi access points and cell towers will be sent only if you have agreed to allow the "Check In" function of the "Me" feature to access and use location information.

You will receive a notice on your phone when software updates are available, and you can always disable all access to location information by applications and collection of location information by the Windows Phone location service at any time by going to <b>Settings > Location</b> and toggling the location switch to <b>OFF</b>.

Microsoft is committed to protecting your privacy, while delivering software that brings you the performance, power, and convenience you desire in your mobile device and services. This privacy statement describes the data collection and use practices of Windows® Phone 7 software and services ("Windows Phone 7"). It focuses on features that communicate with the Internet. It does not apply to other online or offline Microsoft sites, products, or services.

Windows Phone 7 delivers a variety of communication, entertainment, marketplace, and productivity experiences, including Xbox LIVE®, Bing™ for Mobile, Windows Live®, Zune®, and Microsoft® Office Mobile. To help you get to the information that matters most to you, the following links will bring you directly to the information about a specific feature of the phone. Not all features are available in all locations.

Location Services
Email and Accounts
Find My Phone
Internet Explorer Mobile
Keyboard Touch Recognition
Location Check-Ins
Maps
Marketplace
Office Mobile
People
Phone Feedback Program
Phone Update
Pictures &amp; Camera
Search
Speech
Vision
Windows Live ID
Xbox LIVE/Games
Zune Music &amp; Video
Collection and Use of Your Information

As part of your use of Windows Phone 7 and related services, we will collect some information from you in order to enable the features you are using and provide the service(s) or carry out the transaction(s) you have requested or authorized. Information we receive may also be used to analyze and improve Microsoft products and services unless more limited purposes are specified for a feature in the Specific Features section below. Certain information we collect from you is used for displaying content and advertising that are customized to your interests and preferences. For more information about the use of information for advertising, see the Display of Advertising section below.

On our web-based experiences on the phone, we may collect information about your visit to our sites. For example, we may use web analytics tools to retrieve information about the pages and content you view within our sites and the actions you take on a site, such as searches for content or applications, the purchase of applications or content or the streaming of content.

To offer you a more consistent and personalized experience in your interactions with Microsoft, information collected through one Microsoft service may be combined with information obtained through other Microsoft services. We may also supplement the information we collect with information obtained from other companies. For example, we may use services from other companies that enable us to derive a general geographic area based on your IP address in order to customize certain services to your geographic area.

Collection of Standard Information about Your DeviceWhen you use software with Internet-enabled features, information about your phone ("standard device information") is sent to the websites you visit and online services you use. Microsoft uses standard device information to provide you Internet-enabled services, to help improve our products and services, to help keep your software up to date, to certify

your device, and for statistical analysis. Standard device information typically includes information such as your IP address, operating system version, browser version, and regional and language settings and a unique ID we generate for your device. In some cases, standard device information may also include a hardware ID, the first six digits of your International Mobile Subscriber Identity (IMSI) or other device identifiers that indicate the device manufacturer, device name, version, and mobile operator. If a particular feature or service sends information to Microsoft, standard device information will be sent as well.

To learn more about how specific applications or features collect and use your information, please go to Specific Features or use the links at the top of the privacy statement to get to the information you want about a specific application or feature.

Display of Advertising
Certain applications you download from Marketplace may display advertisements using Microsoft's advertising platform.

When we display personalized targeted ads, we take a number of steps designed to protect your privacy. For example, we store page views, clicks and other actions and search terms used for ad personalization targeting separately from your contact information or other data that directly identifies you (such as your name, email address, etc.). Further, we have built in technological and process safeguards designed to prevent the unauthorized correlation of this data. We also give you the ability to opt out of personalized targeted ads. If you would prefer to opt out of Microsoft's interest-based advertising, please visit Microsoft's opt-out page, and select the On any computer or device after I've signed in to Windows Live™ opt-out option and enter the Windows Live ID you use to access Marketplace on your Windows Phone.

We may use certain information that we receive from you to select advertising that we believe may be more relevant to you. For example, we may select the ads we display according to certain general interest categories or segments that we have inferred based on (a) demographic or interest data, including any you may have provided when creating an account (such as age, ZIP or postal code, gender), demographic or interest data acquired from other companies, and a geographic location derived from your IP address, (b) the pages you view and links you click when using Microsoft's and its advertising partners' websites and services, (c) the search terms you enter when using Microsoft's Internet search services, such as Bing, (d) the actions you take when using Microsoft services, such as purchasing, streaming and downloading content and applications, and (e) information about the users you most frequently interact with through Microsoft's communications or social networking services, such as Messenger. To learn more about display of advertising on Microsoft websites and online services, and the sites and services of our advertising partners, visit Personalized Advertising from Microsoft and the Microsoft Online Privacy Statement.

Microsoft recommends that you review the privacy policies and practices of the applications that display advertising to learn more about information they pass to ad networks and any additional application controls regarding the display of advertising.
How We Communicate with YouWe may send certain mandatory service communications such as welcome letters, billing reminders, information on technical service issues, and security announcements to the email address you provided for password resets when creating your Windows Live ID. Depending on your location, you may also have the opportunity to receive periodic communications about Windows Phone 7 products, services, events and surveys. You can follow the instructions in communications you receive to unsubscribe from future communications.

Information Shared with OthersExcept as described in this privacy statement, your personal information will not be transferred to third parties without your consent. We occasionally hire other companies to provide limited services on our behalf, such as packaging, sending and delivering purchases and other mailings, answering customer questions about products or services, processing event registration, or performing statistical analysis of our services. We will only provide those companies the personal information they need to deliver the service, and they are prohibited from using that information for any other purpose.

Microsoft may access or disclose information about you, including the content of your communications, in order to: (a) comply with the law or respond to lawful requests or legal process; (b) protect the rights or property of Microsoft or our customers, including the enforcement of our agreements or policies governing your use of the services; or (c) act on a good faith belief that such access or disclosure is necessary to protect the personal safety of Microsoft employees, customers, or the public. We may also disclose personal information as part of a corporate transaction such as a merger or sale of assets.
Information Storage and TransferInformation that is collected by or sent to Microsoft by Windows Phone 7 may be stored and processed in the United States or any other country in which Microsoft or its affiliates, subsidiaries, or service providers maintain facilities. Microsoft abides by the safe harbor framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of data from the European Union, the European Economic Area, and Switzerland.
Security of Your InformationMicrosoft is committed to helping protect the security of your information. We use a variety of security technologies and procedures to help protect your information from unauthorized access, use, or disclosure. For example, we store the information you provide on computer systems with limited access, which are located in controlled facilities.

You can also take steps to help protect information on your phone by using our PIN lock feature. PIN lock allows you to require a passcode to access your phone when locked. To learn more about PIN lock and to enable PIN lock on your phone, go to Settings > Lock + wallpaper.
Changes to this Privacy StatementWe will occasionally update this privacy statement to reflect changes in our products, services, and customer feedback. When we make changes, we will revise the "last updated" date at the top of the privacy statement. If there are material changes to the privacy statement or in how Microsoft will use your personal information, we will notify you either by posting a notice of such changes prior to implementing the change or by directly sending you a notification. We encourage you to periodically review this privacy statement to be informed of how Microsoft is protecting your information.
For More Information/Access RequestsMicrosoft welcomes your comments regarding this privacy statement. If you have questions about this statement, believe that we have not adhered to it, or want to request access to the personal information we've collected, please contact us using our web form or use the contact information provided below.

Microsoft Privacy
Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052 USA
<h2 id="specific_features">Specific Features:</h2>
<h2 id="location_services">Location Services</h2>Information Collected or Stored and How It's Used:On Windows Phones, "location services" refers to the phone software and online service that is used to determine the approximate location of your phone and provide location to the applications or websites you allow to access your phone's location.

If you allow an application or website to access your phone's location, each time it requests location, information about nearby cell towers, Wi-Fi access points, and available Global Positioning System (GPS) information may be collected by Microsoft's location service and used to help determine the approximate location of your phone.

For example, if you have Wi-Fi enabled on your phone, the Media Access Control (MAC) addresses and signal strength of Wi-Fi access points available to your phone will be collected by Microsoft's location service. If you are connected to a cellular network, identifiers of the cell towers available to your phone will be collected. If GPS is available, the latitude, longitude, speed, and direction of the phone provided by the GPS may be collected. Again, Microsoft collects this information only if you allow a website or application to access your phone's location.

Based on the information received, the location service will determine your phone's approximate location and provide it to the requesting website or application. The location service provides the latitude, longitude, speed, direction, and altitude of your phone. It does not provide information about available cell towers or Wi-Fi access points or any phone identifiers.

Microsoft recommends that you review the privacy policies and practices of the websites and applications that you allow to access your phone's location to learn about how they use the location information they request.

We do not store any information that could directly identify you, such as your name, phone number, email address, or address or information that could indirectly identify you, such as unique device identifiers, with the information received by our location service and we don't use any information received by our location service to identify or contact you. The information received and stored by our location service is only used to provide location to requesting applications and websites and to update and improve the accuracy, efficiency, and reliability of the location service. For more information on Windows Phone and location privacy, see /windowsphone/en-us/howto/wp7/web/location-and-my-privacy.aspx.
Your Choices:Before a website or application can access your phone's location, you must agree to allow access.
You can later enable or disable an application's access to your phone's location in the application's settings. For example, to disable the map application's access to your phone's location, you can go to Settings > Applications > Maps and toggle the location switch to Off. This option may not apply to applications from third parties which you have installed on the phone.
To disable access to your phone's location by all applications and websites, go to Settings > Location and toggle the location switch to Off. If you later toggle the location switch to On, your application-level location settings will be restored.

<h2 id="email">Email and Accounts</h2>Information Collected or Stored and How It's Used:As part of an email account set up on the phone, the phone will send the domain portion of your email account to return the account settings applicable for that mail provider. Only the domain portion is sent (such as hotmail.com), not your full email address.

To make it easier to access and to keep email and other synchronized content, such as calendar items, contacts, photos, and feeds up to date on your phone, we will also automatically save your sign-in credentials and/or sign-in tokens to the phone.

When you add an email account or a social networking account to your phone, such as Facebook, your

phone will automatically retrieve available messages, contacts, photos and feeds to help keep the information on your phone from these accounts up to date.
Your Choices:
You can change the settings for most types of accounts to update your content less often, or only when you choose. To change your update frequency settings for an account or the content you synchronize:Go to Settings > Email + accounts.
Tap the account you want to change.
In the Download new content list, choose how often you want to receive updated content. If you only want to receive them when you request them, tap Manually.
In the Content to sync list, clear the check boxes of the content you do not want to sync.

The content from Facebook accounts is always updated automatically. If you don't want to receive Facebook updates, you need to delete your Facebook account from your phone. To delete a Facebook account: Go to Settings > Email + accounts.
Tap and hold Facebook.
Tap Delete.

To delete other accounts:Go to Settings > Email + accounts.
Tap and hold the account you want to delete.
Tap Delete.

<h2 id="find_my_phone">Find My Phone</h2>Information Collected or Stored and How It's Used:The Find My Phone feature allows you to map, ring, lock, or erase your phone from the web. To provide the features that allow you to ring or send an SMS to a lost phone, your phone number is collected. To provide you with instructions to unlock your phone, we use the email address that you provided. To provide the features that allow you to find and protect a lost phone, which include finding the last known location of your phone on a map and remote locking and/or erasing a phone, your battery level, phone capabilities (such as whether SMS or GPS location positioning is available) and whether the phone has PIN lock or SIM card lock enabled are collected.

There are two ways that we determine the location of your phone:If you've enabled the sending location feature from the Find My Phone settings on your phone, the location of your phone will be sent periodically to your online account at www.windowsphone.live.com. The Find My Phone feature only stores the last known location of your phone. When a new location is sent, it replaces the previously stored location.
From your online account at www.windowsphone.live.com, you can request to find the current location of your phone. Note that when you make a request from your online account, it will try to retrieve the location of your phone regardless of whether sending location within Find My Phone or location services are enabled on your phone.

Your Choices:Sending location is off by default and you can always toggle the setting at Settings > Find my phone.
To completely disable the Find My Phone feature, you can log in to www.windowsphone.live.com, go to Settings, and remove your phone.

<h2 id="IEmobile">Internet Explorer Mobile</h2>Information Collected or Stored and How It's Used: Favorites and History:

Internet Explorer® Mobile stores websites you've saved as your favorites. Internet Explorer also has a

history folder that contains a list of links you have visited recently.

Cookies:

Cookies may also be stored to your phone. A cookie is a small text file that is placed on your hard disk by a website. Cookies are uniquely assigned to you, and can only be read by a website or web server in the domain that issued the cookie to you. Cookies cannot be used to run programs or deliver viruses to your computer.

A cookie is often used to personalize your visit to a website or to save you time. For example, to facilitate a purchase, the cookie could contain shopping cart information such as your current selection, as well as contact information such as your name or email address. To help websites track individual visitors, cookies often contain a unique identifier. It is up to the website that created the cookie to disclose to you what information is stored in the cookie and how that information is used.

Auto-suggestions:

To help get you to the content you want to find more quickly, Internet Explorer automatically suggests websites as you type. Auto-suggestions can come from your History, Favorites, or from the Bing service. To get suggestions from the Bing service, what you type in the address bar or search bar is sent to the Bing service as you type it.

Browsing History:

If you've allowed Internet Explorer to collect your browsing history data, the website addresses that you have visited will be sent to improve the Bing search experience.

Location:

If you've allowed a website to access your location, each time it requests location, information about nearby cell towers, Wi-Fi access points, and available Global Positioning System (GPS) information may be collected by Microsoft's location service and used to help determine the approximate location of your phone.

Your Choices:

Browsing History:If you do not want browsing history to be sent to Microsoft, you can go to Settings > Internet Explorer and clear the Allow Internet Explorer to collect my browsing history check box.

Delete Browsing History:In one step, Internet Explorer's Delete history feature lets you clear website passwords that you asked Internet Explorer to save, entries in Internet Explorer's history folder, web form data, temporary Internet files, and cookies that have been saved to your phone. This feature deletes data stored to your phone and does not delete any browsing history or other search data previously sent to Microsoft.

To delete history:

Go to Settings > Applications > Internet Explorer.
Tap Delete history.

Blocking Cookies:You have the ability to block cookies. If you decide to block cookies, the websites that use them might not function correctly. For example, if you do not allow cookies at all, you might not be able to view some websites or take advantage of customization features (such as local news and weather, or stock quotes).

To block cookies:

Go to Settings > Applications > Internet Explorer.
Clear the Allow cookies on my phone check box.

Auto-Suggestions:
If you do not want auto-suggestions from the Bing service:

Go to Settings > Applications > Search.
Clear the Get suggestions from Bing as I type check box.


Location

Before a website or application can access your phone's location, you must agree to allow access.


<h2 id="keyTouchRecog">Keyboard Touch Recognition</h2>Information Collected or Stored and How It's Used:By choosing to send Microsoft keyboard touch information, you can help Microsoft improve typing on Windows Phone and other Microsoft products and services. You can participate by choosing the Recommended settings when setting up your phone or by enabling collection in Settings > Keyboard.

When you participate, keyboard touch information used by Windows Phone to recognize your intended characters (called "touchpoints") will be sent whenever you use the software-based or hardware keyboard on the phone, along with any typing corrections and automatic completions.

Because knowing what kind of words people type on a mobile phone improves the ability of the keyboard to correctly interpret your touchpoints, the recognized text will also be sent.

To protect your privacy, we do not collect keyboard touch information when the phone displays a login screen or "Enter Password" field. We also take measures that are designed to prevent us from collecting email addresses and numeric sequences such as phone numbers, credit card numbers, and so on. Because we aggregate text from many users and transform it into counts of character and word sequences, it is impossible to identify who typed any particular word. Furthermore, because the data is sent with a random ID, the data cannot be traced back to you.

Your Choices:
You can disable the sending of keyboard touch information to Microsoft at any time by going to Settings > Keyboard, tapping Typing settings, and clearing the Send keyboard touch information to improve typing and more.
<h2 id="locCheckIns">Location Check-Ins</h2>Information Collected or Stored and How It's UsedYou can use your Windows Phone to let your friends know where you are by posting "check-ins" to

Facebook. To do this, first you must allow Windows Phone to access your location. If you agree, then information may be collected by Microsoft's location service and used to help determine the approximate location of your phone. For details, please see the Location Services section of this statement.

You can also search for specific locations you want to post in a check-in. When you search for these locations, data is provided to the Bing search service to deliver results. This data includes your location, as well as time and date, the terms you search for, and a pseudonymous identifier.

To learn more about the information collection practices of Bing, please see the Search section of this statement, and also the Microsoft Online Privacy Statement and Bing Privacy Supplement available at http://go.microsoft.com/fwlink/?LinkId=81184.

When you "check in" to post a location, your phone will pass on to Facebook the data necessary to create the post you requested. This includes some information about your device: location, time zone, a time stamp, and—if your location was found using a search—the search string. We also pass on information about the place you've posted, including its name, location (latitude/longitude), street address, phone number, and category or type (for example, a restaurant, store, or bar). Over time, you may be able to use services in addition to Facebook. When you check in to a location, Microsoft will record that a pseudonymous entity checked in to this place. We use that to improve results from future check-in searches issued from the device.

You have the option to allow this information to be collected by Microsoft as well, which can help improve the relevancy of search results provided to you. This information is stored in association with your Windows Live ID to help personalize your search results.

Your Choices:

Before check-ins can access your location, you must agree to allow access.
You can also choose to allow or not allow Bing to associate your Windows Live ID with information about the check-ins you post to Facebook.

<h2 id="maps">Maps</h2>Information Collected or Stored and How It's Used:If you've allowed Maps to access your location, the approximate location of your phone, along with any queries you make in Maps, will be sent to Microsoft to provide and improve local search and mapping results and directions.

To learn more about the information collection practices of Maps, powered by the Bing service, please review the Microsoft Online Privacy Statement and Bing Privacy Supplement available at http://go.microsoft.com/fwlink/?LinkId=81184.

Your Choices:

To disable the Maps feature's access to your phone's location, go to Settings > Applications > Maps and toggle the Use my location switch to Off.
To clear previously typed map searches, pins and image data from your phone, go to Settings > Applications > Maps and tap Delete history.

<h2 id="marketplace">Marketplace</h2>Information Collected or Stored and How It's Used:To create a new Zune/Marketplace account, you may need to provide your age and country/region. If you already

have a Microsoft Billing account, you'll be able to use the payment method(s) you've already added to purchase content and applications from Marketplace. We also collect your email address so that we can provide you with instructions to download an app from the Windows Phone Marketplace.

Windows Phone collects certain pseudonymous data from your device in order to allow you to bill charges for applications through your mobile operator. To do this, we collect data that identifies your device from the phone and from any Subscriber Identity Module ("SIM") card (not all phones utilize SIM cards), which we transmit on a secured channel to a Microsoft service. That service, in turn, provides the identity of the operator associated with the device. For this purpose, wherever possible, we truncate identifiers from your SIM card so that it provides only data about the mobile carrier and not your specific device. If you choose to purchase an application and bill it to your mobile operator, we will collect the telephone number associated with your device in order to be able to resolve questions about purchase failures, pricing or other issues with downloads billed to your operator. We do not use telephone numbers collected with application purchases for any other purpose, nor do we share that data with any party other than your mobile operator.

For new accounts, we will auto-generate a nickname (which we refer to as a gamertag or Zune tag) that is used to identify you on the Xbox LIVE service, Zune service, and on Marketplace when submitting reviews of applications. You can change the auto-generated nickname by tapping your gamertag in the Games Hub.

IDs of the applications you've installed on your device are sent periodically to Marketplace to determine if there are available updates for any applications you've installed.

Your Choices:

You can edit or remove billing information for your Microsoft account by signing in to your account at Microsoft Billing and Account Management.
You can choose whether to install updates to your applications. However, certain updates may be required to operate certain applications.
You can edit a review you posted by selecting your review and clicking or tapping your review text.

## Office Mobile
Information Collected or Stored and How It's Used:User Name
By default, every file saved by Microsoft® Excel® Mobile, Microsoft® OneNote® Mobile, Microsoft® PowerPoint® Mobile, and Microsoft® Word® Mobile includes file properties such as the following:

Author
Last Saved By

Additionally, if you save comments to a file, Office Mobile includes your user name with each comment. This information is then available to anyone who has access to your file.

Automatic sync of Office documents and notes

Once you have configured your phone with Windows Live ID, you can sync documents and notes you create on your phone. If you have configured your phone with Windows Live ID, documents and notes in your SkyDrive account are automatically synced to your phone. Documents (Word, Excel, and PowerPoint) that you create on the phone are synced only when you take an explicit action to save the

document to SkyDrive. OneNote files are automatically synced to SkyDrive when you close the file or switch to another function. If you've permitted other people to access your My Documents in your SkyDrive account, we'll remind you before we set up your default phone notebook to sync with your SkyDrive account.

SharePoint Mobile

You can import a list of SharePoint sites and save your domains and network credentials to the phone used to access certain SharePoint sites.

When you access a SharePoint site, if you have permissions to create a new subsite on that site, the site saves cookies to your computer. Taken together, these cookies form a list of sites to which you have permissions. This list is used by several Office programs to provide you with quick access to the sites that you have visited before.

The list of sites that you have visited is not accessed by Microsoft and is not exposed to the Internet unless you choose to make the list more broadly available.

In SharePoint, when you create a new website or list, or add or invite people to an existing website or list, the site saves the following for each person, including:

Full name
Email address

A user ID is added to every element that you or the other users of the site add to or modify on the site. As with all of the content on the SharePoint site, only administrators and members of the site itself should have access to this information.

All elements of the SharePoint site include two fields: Created By and Modified By. The Created By field is filled in with the user name of the person who originally created the element and the date when it was created. The Modified By field is filled in with the user name of the person who last modified content and the date when it was last modified.

Administrators of the servers where SharePoint sites are hosted have access to some data from these sites, which is used for analyzing the usage patterns of the site and improving the percentage of time that the site is available. This data is available only to the server administrators and is not shared with Microsoft unless Microsoft is hosting the SharePoint site.

The data specifically captured includes the names, email addresses, and permissions of everyone with access to the site. All users with access to a particular SharePoint site might search and view all content available on that site.

SharePoint provides auditing features that allow administrators to keep a reliable audit trail of how users are working with certain content. When SharePoint administrators enable the auditing feature, the server automatically records in the SharePoint content database certain actions performed by the user. These actions include view, edit, check-in, and check-out. For each recorded action, the server records identifying information about the file, the action, and the user's SharePoint ID. No data is sent to Microsoft as part of this feature.

This feature is off by default and is available only to administrators of SharePoint sites where content is stored.

Your Choices:

To change the user name associated with your files, such as file properties and comments, go to Settings > Applications > Office and change or clear the user name.
To delete or modify your saved UAG network credentials, go to Settings > Applications > Office, and then tap UAG server.
To delete all Office settings and content including saved SharePoint sites, SharePoint documents, SkyDrive documents, settings and credentials from your phone, go to Settings > Applications > Office > Reset Office.

<h2 id="people">People</h2>Information Collected or Stored and How It's Used:If you entered a Windows Live ID to use certain features of the phone and you already have contacts saved with your Windows Live ID, they will be automatically synced with your phone.

Windows Live also gives you a variety of ways to back up your information online. When you sign in with your Windows Live ID on the phone, your contacts that are saved on your phone—those you've imported from a SIM card or added to your phone directly—are automatically backed up to your online Windows Live account.

You have the ability to link contacts and contact information from multiple sources into a single contact card. Items that are synchronized, or linked information from third-party accounts, such as Facebook, are not backed up to Windows Live.

The Recent page of the People Hub shows the last eight people from your contact list that you've called or texted, received a call or text from, or taken some other action in the People Hub. The recent page only shows the people from your contact list and does not display any information about the interaction—for example, that you received a call from the contact.

Your Choices:

When you set up an email account or a social networking account such as Facebook, your phone will automatically retrieve available messages, contacts, photos, and feeds, so that the information on your phone from these accounts is always up to date.

You can change the settings for most types of accounts to update your content less often, or only when you choose. To change your update settings for an email account or the content you synchronize:

Go to Settings > Email + accounts.
Tap the account you want to change.
In the Download new content list, choose how often you want to receive updated content. If you only want to receive updated content when you request it, tap Manually.
If available, in the Content to sync list, clear the check boxes of the content you do not want to sync.

The content from Facebook accounts is always updated automatically. If you don't want to receive Facebook updates, you need to delete your Facebook account from your phone.

To delete a Facebook account:

Go to Settings > Email + accounts.
Tap and hold Facebook.
Tap Delete.

To delete other accounts:

Go to Settings > Email + accounts.
Tap and hold the account you want to delete.
Tap Delete.

<h2 id="feedback">Phone Feedback Program</h2>Information Collected or Stored and How It's Used:By participating in the Windows Phone Feedback Program (feedback), you can help Microsoft improve Windows Phone. You can participate by choosing the Recommended settings when setting up your phone or by enabling feedback in Settings > Feedback. The feedback program collects information about how people use Windows Phones and about some of the issues that they encounter.

When you choose to participate, we collect basic information about how you use your programs and your device, and we note software operation errors. We also collect information about how your phone is set up, and how it's performing.

The following categories of data may be collected in reports and sent to Microsoft periodically using available data connections:


Phone configuration, such as the network connections in use, screen resolutions for the device, memory use, battery life, domain settings for email accounts you've set up, and which version of Windows Phone software is running.
Performance and reliability, such as how quickly a feature responds when you tap an icon or click a button, how many problems you experience with a feature, and how quickly information is sent or received over a network connection.
Application use, such as the features that you use the most often, what features you pin to the Start screen, how you navigate menus and the Marketplace, how often you change settings and update feeds and contact info, and how long you are using certain features.
Software operation errors, such as problems that interrupt you while you use your device, and errors that occur behind the scenes. Reports might contain personal information, but Microsoft uses this information to diagnose errors, not to identify you or contact you. For example, a report that contains a snapshot of device memory might include your contact list, part of an email or SMS you were working on, or data that you recently submitted to a website.
Feedback and screen images you voluntarily submit to Microsoft.

The feedback program also generates a unique ID that is stored on your device and sent with feedback reports to uniquely identify your device. The unique ID is a randomly generated number that does not contain any personal information. We use the unique ID to distinguish how widespread the feedback we receive is and how to prioritize it. For example, the unique ID allows Microsoft to distinguish between one customer experiencing a problem 10 times and other customers experiencing the same problem once. Microsoft does not use the information collected by feedback reports to identify you.

Microsoft uses this information found in reports to improve the products and features that people use most often and to help create solutions to common issues. With respect to error reports sent by the feedback program, Microsoft employees, contractors, vendors, and partners may be provided access to information in such error reports. However, they may use the information only to repair or improve the products that they publish or manufacture. For example, if an error report indicates that a third-party product is involved, Microsoft may send that information to the vendor of the product.

To improve the products that run on Microsoft software, Microsoft may share aggregate information about errors and problems. Aggregate information is used for statistical analysis and does not contain specific information from individual reports, nor does it include any personal or confidential information that may have been collected from a report.

Your Choices:
You can change the phone feedback setting at any time by going to Settings > Feedback.
To only send feedback reports when your phone is connected to your computer or available Wi-Fi networks, go to Settings > Feedback and clear the Use my cellular data connection to send feedback check box.

## Phone Update

Information Collected or Stored and How It's Used:Microsoft releases useful or critical improvements in the form of updates for your phone. To make sure you know about any update as it becomes available, your phone scans regularly for available updates. When new updates are available, you will be prompted to connect your phone to the Zune software on your computer to download and install available updates. Each time the phone update feature checks for available updates, or when you choose to install updates, standard device information is sent to Microsoft. This information is used to determine the updates that are appropriate and applicable for your phone and to operate, analyze, and maintain phone update service, and for internal business purposes. Standard device information is also used to generate aggregate statistics that help us analyze successes, failures and errors you experience with the phone update services.
Your Choices:
You can choose to install available updates.
If you do not want to check for updates using your cellular network plan, go to Settings > Phone update and clear the Use my cellular data connection to check for updates check box. Updates will still be checked when connected to Wi-Fi connections.

## Pictures & Camera

Information Collected or Stored and How It's Used:If you've allowed Camera to access your location, when you capture a photo, your location will be stored as metadata of the captured photo. For photos, your location information is stored in the Exchangeable Image File Format (EXIF) tag.

You have the ability to share photos that include your location information with online services, such as social networks. These online services may be able to view the location information stored in photos or may allow the location information to be viewable by others. If you allow Camera to store location in photos you capture, please be aware that choosing to share photos with online services and applications may expose this location information to the online service, application, or others. Where you upload photos using the Share on Facebook or Automatically upload to SkyDrive functions native to Windows Phone, you can utilize a setting change to remove location information from the metadata of photos you share. This setting change will not remove location data when you share photos via 3rd party applications or websites you access with the phone. Microsoft recommends that you review the privacy policies, practices and settings of online services and applications before sharing your photos with them.

You can choose to automatically upload captured photos to a SkyDrive folder associated with your Windows Live online account. Your photos and videos will also be synchronized with your computer using the Zune software on your personal computer, if you have set up a sync relationship.

Your Choices:

To disable Camera's ability to tag photos and videos you've captured with your phone's location, go to Settings > Applications > Pictures + camera and toggle the Include location info in pictures you take switch to Off.
If you no longer want to upload photos automatically to your SkyDrive folder, go to Settings > Applications > Pictures + camera and toggle the Automatically upload to SkyDrive switch to Off.
If you would like to have location information removed from the metadata of photos you upload from your phone to Facebook or SkyDrive using the functions native to Windows Phone, go to Settings > Applications > Pictures + camera and toggle the Keep location info on uploaded pictures switch to Off.
If you no longer want to sync photos and videos with the Zune software on your personal computer, you need to remove the sync relationship with your PC. Otherwise photos and videos will be automatically synced. To remove the sync relationship, you can start the Zune software and remove the device.

<h2 id="search">Search</h2>Information Collected or Stored and How It's Used:If you've allowed Search to access your location, the approximate location of your phone along with the search query will be sent to provide and improve local search and mapping results.

To help get you to the content you want to find more quickly, Search automatically suggests search terms as you type. Auto-suggestions can come from your search history or from the Bing service. To get suggestions from the Bing service, what you type in the address bar is sent to the Bing service as you type it.

To learn more about the information collection practices of Bing, please review the Microsoft Online Privacy Statement and Bing Privacy Supplement available at http://go.microsoft.com/fwlink/?LinkId=81184.

When you utilize the Music Search functionality, an audio "fingerprint" of the audio captured by the microphone is sent to Microsoft to provide you with search results.

Your phone will store a history of music searches you have performed. This history file is not sent to Microsoft and you can clear it from your phone if you wish.

Your Choices:

To disable the Search feature's access to your phone's location, go to Settings > Applications > Search and toggle the Use my location switch to Off.
If you do not want auto-suggestions from the Bing service, go to Settings > Applications > Search and clear the Get suggestions from Bing as I type check box.
To clear previously typed search terms from your phone, go to Settings > Applications > Search and tap Delete history.

<h2 id="speech">Speech</h2>Information Collected or Stored and How It's Used:When you use speech recognition on the phone, messaging, or voice-activated search, your voice commands (such as "Call

Mom" or "Search for pizza") will be sent to Microsoft to process and respond to the request. We also collect related data (such as recently-spoken contact names) to assist in predicting the best response. When voice commands are sent to Microsoft, Microsoft generates a unique ID that is stored on your device and sent with requests to distinguish speech requests, which helps improve the speech service. The unique ID is a randomly generated number that does not contain any personal information.

Your Choices:

If you do not want voice commands to be sent to Microsoft, you can go to Settings > Speech and clear the Enable speech recognition over the network check box.
If you disable this option, you will not be able to search online or send a message via voice, but you will still be able to use other supported voice commands, such as "Call Mom" or "Start Internet Explorer."

<h2 id="vision">Vision</h2>Information Collected or Stored and How It's Used:
Vision collects a series of frames from a scan performed by the phone's camera and sends data to Microsoft about what it is you would like Bing to search for. For more information on Bing and its privacy policies, please see http://privacy.microsoft.com/en-us/bing.mspx.

If you use vision search to scan a Microsoft Tag (a two-dimensional barcode), standard device information about your phone is sent to Microsoft and, if you've allowed visual search to access your location, the approximate location of your phone is also sent to Microsoft. Microsoft may also send the standard device information and location data collected to the Tag creator so that it can provide more personalized services based on your device and other Tags that you have scanned from the same Tag creator. For example, if you scan a Tag on a movie poster, the information collected by Microsoft is provided to the publisher of the poster, who may use it to provide you with nearby show times for the movie. Tag creators' use of this information is subject to their privacy practices, and not this privacy statement.

When you tap Vision in Search, the phone camera scans whatever is in its field of vision for a small period of time, in order to help identify what it is Bing should search for. You should be conscious that this could result in inadvertently sending some extraneous frames to Microsoft and be aware of where you are pointing the camera.

As with ordinary Bing search, standard device information is sent to Microsoft in order to determine where Search results should be returned, to return results in the proper layout and format. If you've allowed Search to access your location, the approximate location of your phone, along with the search query, will be sent to provide and improve local search and mapping results.

Your Choices:

Disable location:To disable the Search feature's access to your phone's location, go to Settings > Applications > Search and toggle the Use my location switch to Off.
Do not store and search images:If you would prefer Microsoft to not store images you have sent in Visual Search, go to Settings > Applications > Search and clear the Allow Microsoft to store and use images from vision searches check box.

<h2 id="windowsliveid">Windows Live ID</h2>Information Collected or Stored and How It's Used:To access certain services and features on the phone, such as purchasing applications, music, or games from Marketplace, connecting with Xbox LIVE or using your Zune Pass, you will be asked to enter an email

address and password, which we refer to as your Windows Live™ ID. If you have an existing Windows Live ID, you can use that ID or you can create one using the phone. To make it easier to access these services on your phone, your Windows Live ID is automatically saved to your phone. That way, you will not need to sign in each time you use the preinstalled features on your phone such as Marketplace and Xbox LIVE.

After you create your Windows Live ID, you can use the same credentials to sign in to many different Microsoft sites and services, as well as those of select Microsoft partners that display the Windows Live ID logo. By signing in to one Microsoft site or service, you may be automatically signed in when you visit other Microsoft sites and services. To learn more about information collection practices of Windows Live ID and how your credential information is used when you sign in to participating sites, please read the Microsoft Online Privacy Statement at http://privacy.microsoft.com/.

When you create a Windows Live ID, an associated online account is created at www.windowsphone.live.com, which automatically backs up contacts that are saved on your phone (those you've imported from a SIM card or added to your phone directly) and calendar items you've saved to your phone. Contacts and calendar items from third-party services, such as Facebook, are not backed up to your online Windows Live account. To personalize your experience on the windowsphone.live.com portal, the friendly name of your phone, color theme and accents, time zone and locale are collected.

To provide the features that allow you to ring or send an SMS to a lost phone, your phone number is collected. To provide the features that allow you to find and protect a lost phone, which include finding the last known location of your phone on a map and remote locking and/or erasing a phone, your battery level, phone capabilities (such as whether SMS or GPS location positioning is available), and whether the phone has PIN lock or SIM card lock enabled are collected.

Your Choices:

You do not need to create or enter a Windows Live ID to use the phone. If you do not want to create or enter a Windows Live ID, tap Not now when prompted to create or enter a Windows Live ID when setting up your phone. Certain features require a Windows Live ID, such as Marketplace, Xbox LIVE, and the online account features, such as locating, ringing, and locking and erasing a lost phone.
To delete your Windows Live ID sign-in credentials from your phone, go to Settings > About and tap Reset your phone. If you do so, please be aware this will delete data from your phone—including any apps you've bought, music, pictures, and videos—and will reset the phone to the factory settings.

<h2 id="xbox">Xbox LIVE/Games</h2>Information Collected or Stored and How It's Used:To create a new Xbox LIVE account, you may need to provide your age and country/region. For new accounts, we will auto-generate a nickname (which we refer to as a gamertag or Zune tag) that is used to identify you on the Xbox LIVE service, Zune service, and on Marketplace when submitting reviews of applications. You can change the auto-generated nickname by tapping on your gamertag in the Games hub.

If you allow a Microsoft game to access your location, the approximate location of your phone may be periodically sent to Microsoft in order to award achievements, provide in-game rewards, or to customize gameplay. Microsoft games will only collect and store the approximate location of your phone as necessary for these purposes. For example, games may use your location to award an achievement based on the distance traveled between game sessions.

Your phone settings include the option to have your phone connect to Xbox LIVE. When this setting is On, gaming activity and achievement data is sent to Xbox. If you turn this setting to Off, gaming activity and achievement is still stored on your phone. This data will be sent to Xbox when the setting is set back to On and when you connect your phone to a data service.

To learn more about the information collection practices of Xbox LIVE, please review the Microsoft Online Privacy Statement and Xbox LIVE Privacy Supplement available at http://go.microsoft.com/fwlink/?LinkId=81184.

Your Choices:

If you do not want to connect to the Xbox LIVE service from your phone, which among other things allows your gamertag, achievements and scores to be uploaded to leaderboards, the receipt of game invites on the phone, and updates to your profile and gaming history, go to Settings > Applications > Games and toggle the Connect with Xbox LIVE switch to Off. When you toggle the switch back to On, gaming data stored on the phone will be uploaded to Microsoft.
To modify your Xbox LIVE privacy settings, which control things such as how people can contact you, how profile information that you add is shared, and how activities on Xbox LIVE are shared, go to Settings > Applications > Games and tap the Xbox LIVE Privacy Settings link. You can also manage your privacy settings at Xbox.com by signing in to your account.
To disable a Microsoft game's access to your phone's location, go to the game Help/Options menu and turn off access to location.

<h2 id="zune">Zune Music & Video</h2>Information Collected or Stored and How It's Used:To create a new Zune/Marketplace account, you may need to provide your age and country/region. For new accounts, we will auto-generate a nickname (which we refer to as a gamertag or Zune tag) that is used to identify you on the Xbox LIVE service, Zune service, and on Marketplace when submitting reviews of applications. You can change the auto-generated nickname by tapping on your gamertag in the Games Hub.

If you choose to personalize your Zune experience, Zune will collect information about the songs you play in Zune and the ratings you give songs. This information is used to help provide you with content and features that are more tailored to the music you like and to allow you to share your recent music plays with others through the Zune Social available through Zune.net and through the Zune software on your computer. It is also used in aggregate form to create top charts.

To enrich your experience when playing or browsing content, Zune may display related information about the content you play and the content in your Zune library, such as the album title, cover art, song or video title, artist pictures, artist bios and other information, where available. To download this information, Zune sends an information request to Microsoft containing standard device information and an identifier for the content.

If you connect your phone to the Zune software on your computer, standard device information is sent to distinguish the phone from other devices associated with the Zune software and to customize content, such as support and help links based on the connected phone.
To learn more about the information collection practices of Zune, please review the Microsoft Online Privacy Statement and Zune Privacy Supplement available at http://go.microsoft.com/fwlink/?LinkId=81184.

Your Choices:

To change the setting for sending information about the songs you play and ratings you give, go to Settings > Applications > Music + Videos and tap the Zune Account Settings link to update your privacy settings.

If you do not want to connect with the Zune service to automatically download information related to the content you play, such as artist pictures, bios and other information, go to Settings > Applications > Music + Videos and toggle the Connect with Zune switch to Off.

# EXHIBIT 2



All Microsoft Sites|United States



- Discover
- Buy
- Marketplace
- How-to
- My Phone

Sign in

# Windows® Phone 7 Privacy Statement

Last updated: September 2011

 **IMPORTANT NOTICE**

This notice describes unintended behavior in the Windows Phone software involving location services, explains how Microsoft is eliminating that behavior, and reminds you that you can prevent access to location information if you choose to do so.

As described in the Location Services section of this Privacy Statement, the location information stored and used by the Windows Phone location service is limited information about nearby Wi-Fi access points and cell towers that we use to help provide you with location services more efficiently and effectively. It does not include any information that identifies you or uniquely identifies your device and does not allow Microsoft to track you or your device.

We have identified an unintended behavior in the Windows Phone 7 software that results in information about nearby Wi-Fi access points and cell towers being periodically sent to Microsoft when using the Camera application, and, for phones that are configured for US-English, when using the phone's voice command features (such as "Find Pizza"). For the Camera, the software bug results in the behavior even where you have disabled geo-tagging photos in the Camera application.

The Windows Phone 7.5 update eliminates this unintended behavior by the Camera application and voice command feature. After the update, information about nearby Wi-Fi access points and cell towers will be sent when using the Camera application only if you have agreed to tag your photos with location. For voice commands, location information will no longer be requested and information about nearby Wi-Fi access points and cell towers will not be sent to Microsoft when using voice commands.

We also have identified that the Windows Phone 7.5 update contains an unintended behavior when using the "Me" feature in the People Hub. Each time you access the "Me" feature, information about nearby Wi-Fi access points and cell towers is sent to the Windows Phone location service. The information sent, received and stored by the Windows Phone location service when you use the "Me" feature does not identify you or your individual device. Nevertheless, this behavior is unintended and will be eliminated as part of the next scheduled update to Windows Phone 7.5. After that update, information about nearby Wi-Fi access points and cell towers will be sent only if you have agreed to allow the "Check In" function of the "Me" feature to access and use location information.

You will receive a notice on your phone when software updates are available, and you can always disable all access to location information by applications and collection of location information by the Windows Phone location service at any time by going to **Settings > Location** and toggling the location switch to **OFF**.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| REBECCA COUSINEAU and SAM DUA, individually on their own behalf and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION, a Delaware corporation,<br><br>             Defendant. | Case No. 2:11-cv-01438-JCC<br><br>**PLAINTIFF COUSINEAU'S ANSWERS TO DEFENDANT MICROSOFT CORPORATION'S FIRST INTERROGATORIES** |

Plaintiff Rebecca Cousineau ("Plaintiff" or "Cousineau"), for her answers to

Defendant Microsoft Corporation's ("Defendant") First Interrogatories, states as follows:

### I. General Objections

1.    Plaintiff objects to each Interrogatory, definition and instruction, to the extent

it seeks or calls for the production or disclosure of information protected by the attorney-

client privilege and the work product doctrine, or any other applicable privilege or doctrine.

By responding to any Interrogatory, Plaintiff does not waive, and hereby retains, any

applicable privilege or doctrine as to that Interrogatory, or any other supplemental

PLAINTIFF COUSINEAU'S ANSWERS
TO DEFENDANT'S FIRST INTERROGATORIES
NO. 2:11-CV-01438-JCC

1

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-1332
TEL 206.682.5600 • FAX 206.682.2992

1   software, or Microsoft's alleged creation of a digital map of geographic information.

2                         *                 *                 *

3/4      4.     Please identify each communication you, your attorneys, or any of your or your attorneys' agents or representatives have had either directly or indirectly, orally or in writing, with any member of the putative classes regarding the subject matter of this case.

5     **ANSWER**:   Plaintiff objects to this Interrogatory on the basis that it seeks

6   information protected by the attorney-client privilege and the work product doctrine.

7      Subject to and without waiving her objections, Plaintiff states that she has had no

8   communications with any member of the putative classes regarding the subject matter of this

9   case.

10                         *                 *                 *

11/12/13      5.     For each Windows Phone 7 device that you owned or used, state: (a) the device model (including the size of its storage); (b) the device serial number; (c) the device ID; (d) the version of the operating system currently running on the device; (e) all prior operating systems that were run on the device and the dates each was installed and replaced; (f) the date each device was purchased; (g) the purchase location; and (h) the purchase price.

14     **ANSWER**:   Plaintiff objects to this Interrogatory on the basis that it seeks

15   information that is not relevant or reasonably calculated to lead to the discovery of

16   admissible ("the date each [Windows Phone 7] device was purchased," "the purchase

17   location," and "the purchase price" have no bearing on whether or not Plaintiff's privacy

18   rights were violated by Defendant).

19      Subject to and without waiving her objections, Plaintiff states that she owned or used

20   a Samsung SGH-i917 with 7.39 gigabytes of storage. The serial number of the device is

21   R2XZC92561YI, and the device ID (or IMEI number) is 352982044174905. The device is

22   currently running operating system version 7.10.7720.68. Plaintiff further states that she is

23   unable to identify all prior operating systems that were run on the device or the dates each

24   was installed and replaced, but she has taken steps to preserve her Windows Phone by having

25   the device digitally imaged by a third party forensics firm. Plaintiff will supplement her

26   answer to this Interrogatory, to the extent possible, as additional information becomes known

27   PLAINTIFF COUSINEAU'S ANSWERS       6
TO DEFENDANT'S FIRST INTERROGATORIES
NO. 2:11-CV-01438-JCC

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-1332
TEL 206.682.5600 • FAX 206.682.2992

1   to her.

2       Plaintiff further states that the Windows Phone 7 device that she owned or used was

3   purchased on June 28, 2011, at the AT&T Azrielli Retail Store located at 3201 East Grand

4   River, Suite C, Lansing, Michigan 48912. Plaintiff states that the purchase price of the

5   Windows Phone 7 device was $399.99, but that after Plaintiff Dua agreed to a two-year

6   agreement with AT&T, was free.

7                       *                     *                     *

8       6.    For each Windows Phone 7 device that you owned or used, state: (a) each date
9   and time that Location services was switched "Off" on the Settings menu on the device; and
    (b) each date and time Location services was switched "On."

10     **ANSWER**:   Plaintiff objects to this Interrogatory on the basis that it is unduly

11   burdensome (it requires Plaintiff to recall from memory the exact date and time that she

12   switched Location services "On" or "Off" from the Settings menu on her device). Plaintiff

13   further objects to this Interrogatory on the basis that the information sought is within

14   Defendant's possession, custody or control, and is easily discoverable from Defendant's own

15   records or the records of its agents (Plaintiff anticipates that discovery will show Microsoft is

16   able to discern Windows Phone 7 users who switched "On" or "Off" Location services).

17       Subject to and without waiving her objections, Plaintiff states that her counsel is

18   attempting to have the information sought by this Interrogatory extracted from the device and

19   Plaintiff will supplement her answer, to the extent possible, as additional information

20   becomes known to her.

21                       *                     *                     *

22       7.    For each Windows Phone device that you owned or used, identify (a) any
23   month you exceeded the data limits allotted by your wireless data plan; (b) the amount by
    which you exceeded the data plan; (c) any costs you incurred as result of exceeding the data
24   plan limits; and (d) the circumstances that caused you to exceed data plan limits.

25     **ANSWER**:   Subject to and without waiving her general objections, Plaintiff states

26   that she has no information responsive to this Interrogatory because she is not the account

27   holder for the Windows Phone device.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-1332
TEL 206.682.5600 • FAX 206.682.2992

## DECLARATION

I, Rebecca Cousineau, declare under penalty of perjury that the foregoing ***Plaintiff Cousineau's Answers to Defendant Microsoft Corporation's First Interrogatories*** is true and correct.

Executed on December 13, 2012 at Lansing, Michigan.

_____
Rebecca Cousineau

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-1332
TEL 206.682.5600 • FAX 206.682.2992

# EXHIBIT 4

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON

3                   AT SEATTLE

4   _____

5   REBECCA COUSINEAU,              )
    individually on her own behalf)
6   and on behalf of all others    )
    similarly situated,            )
7                                  )
             Plaintiff,            )
8                                  )
             vs.                   ) No. 11-cv-01438-JCC
9                                  )
    MICROSOFT CORPORATION, a       )
10  Delaware corporation,          )
                                   )
11           Defendant.            )

12  _____

13        30(B)(6) DEPOSITION UPON ORAL EXAMINATION

14                        OF

15                MICROSOFT CORPORATION

16                   ADAM LYDICK

17      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18            PURSUANT TO PROTECTIVE ORDER

19  _____

20                   9:01 A.M.

21                APRIL 26, 2013

22             777 108TH AVENUE NE

23             BELLEVUE, WASHINGTON

24

25  REPORTED BY: JULIE R. HEAD, CRR, RPR, CCR No. 3119



**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973  206.622.6875**
production@yomreporting.com
www.yomreporting.com

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4           RAFEY S. BALABANIAN
             BENJAMIN S. THOMASSEN
 5           Edelson LLC
             350 North LaSalle, Suite 1300
 6           Chicago, Illinois 60654
             312.589.6370
 7           rbalabanian@edelson.com
             bthomassen@edelson.com
 8

 9

10   FOR THE DEFENDANT:

11           STEPHEN M. RUMMAGE
             Davis Wright Tremaine LLP
12           1201 Third Avenue, Suite 2200
             Seattle, Washington 98101
13           206.622.3150
             steverummage@dwt.com
14

15

16   ALSO PRESENT:

17           TIM FIELDEN, Assistant General Counsel
                        Microsoft Corporation
18

19

20

21

22

23

24

25
```


**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973  206.622.6875**
production@yomreporting.com
www.yomreporting.com

```
1                       I N D E X

2

3    EXAMINATION BY:                                    PAGE

4          MR. BALABANIAN                               4

5    EXHIBITS FOR IDENTIFICATION                        PAGE

6    Exhibit 12 Windows Mobile Seven Camera Geo-Tagging   68

7               Functional Specification,

8               MS-COUS_00000138 - 00000153

9    Exhibit 13 Windows Mobile 7 Camera Experience        80

10              Functional Specification,

11              MS-COUS_00000154 - 00000255

12   Exhibit 14 Windows Mobile 7 Camera & Pictures       110

13              Settings, MS-COUS_00000478 - 00000496

14   Exhibit 15 7/20/09 5:35 PM E-mail Chain,            112

15              MS-COUS_00000593 - 00000601

16   Exhibit 16 7/2/09 10:45 AM E-mail Chain,            119

17              MS-COUS_00000602 - 00000606

18

19       EXHIBITS PREVIOUSLY MARKED FOR IDENTIFICATION

20              REFERRED TO IN THIS DEPOSITION

21                                        Page  Line

22       Exhibit 1 ...............................7    10

23       Exhibit 5 ..............................78    23

24       Exhibit 11 .............................72    11

25
```



**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973  206.622.6875**
production@yomreporting.com
www.yomreporting.com

1          BELLEVUE, WASHINGTON;  APRIL 26, 2013

2                    9:01 A.M.

3                    --oOo--

4

5                    ADAM LYDICK,

6     sworn as a witness by the Certified Court Reporter,

7                testified as follows:

8                    EXAMINATION

9  BY MR. BALABANIAN:

10     Q.   Okay.  My name is Rafey Balabanian.  I'm

11  joined with my co-counsel, Benjamin Thomassen.  This is

12  the case of Cousineau verse Microsoft Corporation

13  pending in United States District Court, Western

14  District of Washington at Seattle.

15          This is the deposition on oral examination of

16  Mr. Adam Lydick.

17          Did I pronounce your last name correctly,

18  Mr. Lydick?

19     A.   You did.

20     Q.   Okay.  And pursuant to notice and continued

21  from time to time by agreement of the parties.

22          Mr. Lydick, could you please state your name,

23  full name, and spell it for the record, please.

24     A.   Adam William Lydick, A-D-A-M, W-I-L-L-I-A-M,

25  L-Y-D-I-C-K.


YAMAGUCHI OBIEN MANGIO
court reporting, video and videoconferencing
800.831.6973  206.622.6875
production@yomreporting.com
www.yomreporting.com

 1   question.

 2          THE WITNESS:  So, the change was, again, to

 3   ensure that we had more reliability geotags on the -- on

 4   the images that we captured, and, so, for the -- the

 5   camping or like a vacation without a data plan

 6   scenarios, we wanted to make sure we were able to

 7   acquire those tags, and, so, the original way we did

 8   this was we would begin capturing -- or, sorry, begin

 9   acquiring location information as soon as the camera app

10   launched, and if we had managed to acquire the tag by

11   the time we took a photo, we would add it to the photo.

12          The new technique we used in Mango to ensure

13   we're able to get fixes more reliably was we didn't

14   start any location fixes at all.  We just queued the

15   photos up to be tagged and a background service was

16   responsible for spinning up when it saw there was work

17   to do, then locating the current fix or pulling it out

18   of a cache, if we had a recent fix, and then adding it

19   to the photo after the fact.

20          Q.   (BY MR. BALABANIAN:)  Okay.  Do you know who

21   was in charge of seeing that that change was made?

22          A.   Several different people.

23          Q.   Do you know who?

24          A.   So, I did some of the initial design for it,

25   the PM kind of organized it, and then our dev manager


**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973   206.622.6875**
production@yomreporting.com
www.yomreporting.com

1                    REPORTER'S CERTIFICATE

2

3        I, JULIE R. HEAD, the undersigned Certified Court

4    Reporter, pursuant to RCW 5.28.010, authorized to

5    administer oaths and affirmations in and for the State

6    of Washington, do hereby certify:  That the sworn

7    testimony and/or proceedings, a transcript of which is

8    attached, was given before me at the time and place

9    stated therein; that any and/or all witness(es) were by

10   me duly sworn to testify to the truth; that the sworn

11   testimony and/or proceedings were by me stenographically

12   recorded and transcribed under my supervision, to the

13   best of my ability; that the foregoing transcript

14   contains a full, true, and accurate record of all the

15   sworn testimony and/or proceedings given and occurring

16   at the time and place stated in the transcript, a review

17   of which was requested; that I am in no way related to

18   any party to the matter, nor to any counsel, nor do I

19   have any financial interest in the event of the cause.

20        WITNESS MY HAND AND DIGITAL SIGNATURE THIS 8th day

21   of May, 2013.

22

23



24     JULIE R. HEAD, CRR, RPR
       Washington State CCR No. 3119
25     jhead@yomreporting.com

**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing

**800.831.6973  206.622.6875**
production@yomreporting.com
www.yomreporting.com

```
 1                    CORRECTION & SIGNATURE PAGE

 2    RE:  COUSINEAU vs. MICROSOFT

 3         USDC AT SEATTLE; No. 11-cv-01438-JCC

 4         ADAM LYDICK; TAKEN APRIL 26, 2013

 5              Reported by: JULIE R. HEAD, CCR No. 3119

 6              I, ADAM LYDICK, have read the within

 7    transcript taken APRIL 26, 2013, and the same is true

 8    and accurate except for any changes and/or corrections,

 9    if any, as follows:

10    PAGE/LINE              CORRECTION                    REASON

11    _____ See attached. _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22         Signed at   Redmond        , Washington,

23    on this date:   5/15/2013

24

25                                            ADAM LYDICK
```

RECEIVED
JUN 1 0 2013
YAMAGUCHI OBIEN MANGIO, LLC
COURT REPORTING

ORIGINAL



**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
800.831.6973   206.622.6875
production@yomreporting.com
www.yomreporting.com

| Page / Line | Correction | Reason |
|---|---|---|
| p. 7 (1) | "It went over" should read "I went over" | Typo |
| p. 17 (22) | "admitted" should be "emitted" | Typo |
| p. 18 (18) | "admitted" should be "emitted" | Typo |
| p. 31 (12) | "background task continued" should be "background task that continued" | Typo |
| p. 34 (15) | "work on the photos in camera" should be "work on photos in the camera" | Typo |
| p. 42 (1) | "Clelland" should be "Cleland" | Typo |
| p. 42 (2) | "Clelland" should be "Cleland" | Typo |
| p. 42 (8) | "works" should be "work" | Typo |
| p. 50 (14) | "I believe" should be "I don't believe" | Typo |
| p. 53 (19) | "closed call" should be "close call" | Typo |
| p. 53 (24) | "libraries, but there are" should be "libraries, but they're a" | Typo |
| p. 67 (19) | "we do anything special" should be "we don't do anything special" | Typo |
| p. 75 (15) | "strength" should be "string" | Typo |
| p. 107 (17) | "says selected to" should be "sets the selection to" | Typo |
| p. 116 (15) | "other functional, giving" should be "other functional reviews, giving" | Typo |
| p. 117 (3) | "reliability" should be "reliable" | Typo |
| p. 120 (19) | "for assistance" should be "persistence" | Typo |
| p. 122 (3) | "between it and then" should be "between itself and" | Typo |



YAMAGUCHI OBIEN MANGIO, LLC
ORIGINAL
COURT REPORTING



RECEIVED
JUN 1 0 2019
YAMAGUCHI OBIEN MANGIO, LLC
COURT REPORTING

# EXHIBIT 5

```
 1              CORRECTION & SIGNATURE PAGE
 2  RE:  COUSINEAU vs. MICROSOFT
 3       USDC AT SEATTLE; No. 11-cv-01438-JCC
 4       CRISTINA DEL AMO CASADO; TAKEN APRIL 24, 2013
 5              Reported by: JULIE R. HEAD, CCR No. 3119
 6           I, CRISTINA DEL AMO CASADO, have read the
 7  within transcript taken APRIL 24, 2013, and the same is
 8  true and accurate except for any changes and/or
 9  corrections, if any, as follows:
10  PAGE/LINE            CORRECTION                   REASON
11  9/4- ''reflected accurately'' instead of ''reflected
accurate''  (Unless otherwise stated, all corrections address
transcription errors likely arising from the witness's accent.)
12  9/6- ''Priyanka'' instead of ''Pianca''
13  9/15&16 - ''In general I kind of'' instead of ''In general,
like, kind of''
14  13/21 - ''Specifically'' instead of ''Specific''
15  20/21 and 20/24 - ''configured/associated'' instead of
''configured necessary''
16  21/25 - ''Sometimes'' instead of ''At the time''
17  29/20 - ''device'' instead of ''DS''
18  32/19 - ''alternate'' instead of ''Internet''
19  32/21 - ''put'' instead of ''route''
20  42/24 - ''RIL'' instead of ''real''
21  45/19 - ''does'' instead of ''that's''
22  47/23 - ''that with'' instead of ''that to''
23  47/24 - ''crowd sourcing'' instead of ''cross sourcing''
24  48/11-12 - ''crowd sourcing'' instead of ''cross sourcing''
25  50/8 - ''we would then not upload crowd sourcing at that
point'' - The ''not'' is missing
26  53/4 - ''associate to it the beacon information'' - The
''it'' is missing
27  53/11 - ''one in one'' instead of ''one several''
28  53/21 - ''It was 1 in 100 times that we get'' instead of
''it was 100 times a week''
29  56/23 - ''principle'' instead of ''principal''
30  57/1-3 - Should say: ''the corresponding, you know -- kind
of like identifiers - let's call it identifiers that those
satellites have so they can decode signals and stuff like that,
right?''
31  57/5 - ''open sky conditions'' instead of ''opens kind
conditions''
32  58/3 - ''ephemeris'' instead of ''family's data''
33  58/15 - ''location'' instead of ''application''
34  58/15 - ''decoded the'' instead of ''the call the''
35  58/22 - ''decode'' instead of ''the code''
36  59/2 - ''to'' instead of ''so''
37  60/3-4 - ''IHV'' instead of ''ISV''
38  60/9 - ''from'' instead of ''to''
39  60/12 - ''whatever'' instead of ''what server''
40  61/18 - ''all the time'' instead of ''old time''
41  64/3-4 - ''IHV'' instead of ''ISV''
42  71/15 - ''At least'' instead of ''Unless''
44  74/19 - Remove ''I call''
```

YAMAGUCHI OBIEN MANGIO, LLC
ORIGINAL
COURT REPORTING

RECEIVED
JUN 1 0 2013
YAMAGUCHI OBIEN MANGIO, LLC
COURT REPORTING

45   77/5 - ``description'' instead of ``inscription''
46   77/18 - ``LCA'' instead of ``SEA''
47   78/4 - ``predefined'' instead of ``pretty fine''
48   81/6 - ``set or group of'' instead of ``set of group''
49   84/9 - ``design'' instead of ``assigned''
50   84/14 - ``design'' instead of ``signed''
51   84/19 - ``resolution'' instead of ``service solution''
52   86/20 - ``I'' instead of ``They''
53   87/22-24 - ``calls'' instead of ``codes''
54   88/5 - ``calls'' instead of ``codes''
55   88/9 - ``calls'' instead of ``codes''
56   92/1 - ``I think only **if** the GPS was failing'' instead of
``I think only the GPS was failing''
57   92/24 - ``other'' instead of ``odd''
58   93/4 - ``from'' instead of ``for''
59   95/5 - ``RIL'' instead of ``real''
60   96/2 - ``RIL'' instead of ``real''
61   96/11 - ``internal'' instead of ``internet''
62   97/17 - ``we would have seen if we have anything, in''
instead of ``we wouldn't have seen if we have anything, a''
63   98/23 - ``generic'' instead of ``generate''
64   99/15 - ``check'' instead of ``assert''
65   99/19 - ``flow'' instead of ``note''
66   102/12 - ``a set in memory -- memory.  They -- Like a
store,'' instead of ``a set of memories -- memories.  They --
Like a story,''
67   107/21 - ``more'' instead of ``for now''
68   108/8 - ``negative response'' instead of ``negative''
69   108/16 - ``Avoid'' instead of ``I'm''
70   110/23 - ``valid'' instead of ``value''
71   111/3 - ``follow'' instead of ``flow''
72   111/7 - ``we can'' instead of ``with a''
73   112/4 - ``as the'' instead of ``with the''
74   121/10 - ``check-in some things and we spin new builds''
instead of ``checking some things and we pin new builds.''
75   121/14 - ``External release'' instead of ``standard release''
76   124/13 - ``different'' instead of ``framed''
77   127/22 - ``lawsuit'' instead of ``loss''
78   129/4 - ``This doc is different'' instead of ``This is the
different''
79   132/3 - ``rephrase it as'' instead of ``rephrase that's''
80   132/20 - ``location information, they are trusted.'' instead
of ``location information are trusted.''
81   134/14 - ``associated'' instead of ``succeeded''
82   134/18 - ``components are associated to a given''  instead
of ``components are associated to -- that give an''
83   134/19-20 - ``associated to that'' instead of ``necessary to
that''
84   134/23 - ``that have been'' instead of ``that having''
85   135/11 - ``of the'' instead of ``from the''
86   135/12-13 - ``capabilities associated to it, that gets
defined'' instead of ``capabilities that proceeded to that that
gets defined''

ORIGINAL

RECEIVED
JUN 1 0 2013

```
87    137/8 - ''to see if we can do further restrictions.''
instead of ''to see we can do farther restrictions.''
88    138/15 - '' called or not to get user consent.'' instead of
'' called or not using user consent.''
89    138/11-13 - ''Location Framework'' instead of ''OS'' - as I
read this now, I realize that although I said ''OS,'' it is more
accurate to say ''Location Framework.''
90    141/23 - ''use of the'' instead of ''useable''
91    145/6 - ''fall back'' instead of ''flow it back''
92    145/8 - ''blob'' instead of ''bloop''
93    146/21 - ''With SQM, things do not'' instead of ''With the
SQM, things, you know,''
94    155/8 - ''where'' instead of ''whether''
95    155/15-16 - ''whatever'' instead of ''what server''
96    158/17 - ''only'' instead of ''don't''
97    159/17 - ''settings'' instead of ''set''
98    162/25 - ''like that'' instead of ''that tight''
99    163/8 - ''intention'' instead of ''intentional''
100   163/9 - ''the final implementation did not do it.'' instead
of ''the final implementation to do it.''
101   165/13 - ''attached to'' instead of ''attached by''
102   165/25 - ''bug'' instead of ''back''
103   167/6 - ''crowdsource'' instead of ''cross over''
104   168/12 - ''front-end'' instead of ''militants''
105   169/12 - ''purging'' instead of ''opening'' -
106   171/6 - ''purge the data'' instead of ''put cell data''
107   176/12 - ''edge'' instead of ''age''
108   177/18 - ''position'' instead of ''opposition''
109   178/20 - ''this is AT&T.'' instead of ''this isn't a AT&T.''
110   179/18 - ''device'' instead of ''setting''
111   180/22 - ''dots over a map'' instead of ''doxys cutter (ph)
in a map''
112   182/16 - ''that require'' instead of ''that are required''
113   187/3 - ''protocol'' instead of ''prodigal''
114   187/25 - ''protocol'' instead of ''prodigal''


115   Signed at ___Redmond_____, Washington,
116   on this date: ___6/7/2013_____
117
```

118                                     CRISTINA DEL AMO CASADO

YAMAGUCHI OBIEN MANGIO, LLC
ORIGINAL
COURT REPORTING

RECEIVED
JUN 1 0 2013
YAMAGUCHI OBIEN MANGIO, LLC
COURT REPORTING

# EXHIBIT 6

1              UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4  _____

5  REBECCA COUSINEAU,              )
   individually on her own behalf)
6  and on behalf of all others    )
   similarly situated,            )
7                                 )
            Plaintiff,            )
8                                 )
        vs.                       ) No. 11-cv-01438-JCC
9                                 )
   MICROSOFT CORPORATION, a       )
10 Delaware corporation,          )
                                  )
11          Defendant.            )

12 _____

13      30(B)(6) DEPOSITION UPON ORAL EXAMINATION

14                         OF

15               MICROSOFT CORPORATION

16                     SANDEEP DEO

17     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18            PURSUANT TO PROTECTIVE ORDER

19 _____

20                    10:05 A.M.

21                  APRIL 25, 2013

22               777 108TH AVENUE NE

23               BELLEVUE, WASHINGTON

24

25 REPORTED BY: JULIE R. HEAD, CRR, RPR, CCR No. 3119



**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973  206.622.6875**
production@yomreporting.com
www.yomreporting.com

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4          BENJAMIN S. THOMASSEN
            CHANDLER R. GIVENS
 5          Edelson LLC
            350 North LaSalle, Suite 1300
 6          Chicago, Illinois 60654
            312.589.6370
 7          bthomassen@edelson.com
            cgivens@edelson.com
 8

 9

10   FOR THE DEFENDANT:

11          STEPHEN M. RUMMAGE
            Davis Wright Tremaine LLP
12          1201 Third Avenue, Suite 2200
            Seattle, Washington 98101
13          206.622.3150
            steverummage@dwt.com
14

15

16   ALSO PRESENT:

17          TIM FIELDEN, Assistant General Counsel
                      Microsoft Corporation
18

19

20

21

22

23

24

25
```



**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing

**800.831.6973   206.622.6875**
production@yomreporting.com
www.yomreporting.com

```
 1                          I N D E X

 2

 3   EXAMINATION BY:                                    PAGE

 4          MR. THOMASSEN                                4

 5

 6   EXHIBITS FOR IDENTIFICATION                        PAGE

 7   Exhibit 7  Orion Service API Specification,         21

 8              MS-COUS_00000847 - 00000948

 9   Exhibit 8  Orion Service API Specification for      21

10              WM7, MS-COUS_00000765 - 00000800

11   Exhibit 9  4/4/11 11:55 AM E-mail Chain,            61

12              MS-COUS_00000632 - 00000636

13   Exhibit 10 ID 319557, MS-COUS_00000637 - 00000640   65

14   Exhibit 11 Camera Application Consent Prompt         88

15

16        EXHIBITS PREVIOUSLY MARKED FOR IDENTIFICATION

17             REFERRED TO IN THIS DEPOSITION

18                                            Page  Line

19        Exhibit 1 .............................11     1

20

21

22

23

24

25
```



**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973   206.622.6875**
production@yomreporting.com
www.yomreporting.com

 1              BELLEVUE, WASHINGTON;  APRIL 25, 2013

 2                      10:05 A.M.

 3                      --oOo--

 4

 5                    SANDEEP DEO,

 6    sworn as a witness by the Certified Court Reporter,

 7                 testified as follows:

 8             MR. THOMASSEN:  Okay.  Before we get started,

 9   I just want to mention -- I just mentioned this to

10   Steve, but we have six exhibits that were marked in the

11   deposition -- Cristina's deposition yesterday on

12   April 24th.  They've been marked as Microsoft Exhibits 1

13   through 6, and we're just going to continue on using

14   those today, and then a new exhibit that we introduced

15   today will start with Microsoft Exhibit 7.

16                    EXAMINATION

17   BY MR. THOMASSEN:

18        Q.   So, good morning, Sandeep.

19        A.   Good morning.

20        Q.   I know we've already been introduced, but my

21   name's Ben.  Do you mind if I just call you Sandeep

22   today?

23        A.   Sure.

24        Q.   Okay.  Feel free to call me Ben.

25             Have you ever been deposed before?



YAMAGUCHI OBIEN MANGIO
court reporting, video and videoconferencing
800.831.6973  206.622.6875
production@yomreporting.com
www.yomreporting.com

1    client, and as part of that investigation, we -- as I

2    said, you know, as part of the product team discovery,

3    we realized it is another value within the platform

4    field that was not changing for every request.

5         Q.   (BY MR. THOMASSEN:)  Okay.  That review

6    process, was that a review process for a specific

7    feature of Windows Phone 7?

8         A.   I guess for every service release and, you

9    know, any time there's a service release that needs to

10   be deployed to production, we -- we go through what we

11   call is a privacy review.  That's just one of the exit

12   criterias.  There's a security review, there's other

13   kind of reviews.  So, as part of that privacy review, we

14   were already looking at things around the retention

15   policies for the identifiers.

16             So, we know we had 24 hours for DeviceGUID and

17   90 days for ClientGUID, and we were trying to see if

18   that was really required or not.  And as part of that

19   investigation process, we all came to the conclusion

20   that that piece of information was not going to be

21   beneficial or was not really adding value to the

22   business and decided to remove that information.

23        Q.   Okay.  Can you flip forward to the page marked

24   886?  We're still in Exhibit 7.

25        A.   Yeah.  Yes.


**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973   206.622.6875**
production@yomreporting.com
www.yomreporting.com

 1   and answered.

 2              THE WITNESS:  I am not clear on the question.

 3        Q.  (BY MR. THOMASSEN:)  Okay.  So, part of the

 4   request from the client devices contained this unique

 5   information that Orion wanted to excise, correct?

 6        A.   That is correct.

 7        Q.   But you didn't want to delete all of the

 8   information; just part of it, correct?

 9        A.   That is correct.

10        Q.   So, can you explain to me how the part of it

11   that Microsoft wanted to remove was, in fact, removed,

12   while retaining the rest?  If you know.

13        A.   Again, I'm not a developer, so, I don't know

14   the algorithm, but the front -- the front-end service,

15   when it received the request, would parse the request to

16   remove this piece of unique device identifiers and then

17   send the remainder of the request to the back end to

18   receive the position or whatever the request requested

19   for.

20        Q.   Were those operations that you just described

21   stored in any front-side server logs?

22              MR. RUMMAGE:  Object to the form of the

23   question.

24              THE WITNESS:  Can you clarify a bit further?

25        Q.  (BY MR. THOMASSEN:)  Are there server logs


**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973   206.622.6875**
production@yomreporting.com
www.yomreporting.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, JULIE R. HEAD, the undersigned Certified Court

 4    Reporter, pursuant to RCW 5.28.010, authorized to

 5    administer oaths and affirmations in and for the State

 6    of Washington, do hereby certify:  That the sworn

 7    testimony and/or proceedings, a transcript of which is

 8    attached, was given before me at the time and place

 9    stated therein; that any and/or all witness(es) were by

10    me duly sworn to testify to the truth; that the sworn

11    testimony and/or proceedings were by me stenographically

12    recorded and transcribed under my supervision, to the

13    best of my ability; that the foregoing transcript

14    contains a full, true, and accurate record of all the

15    sworn testimony and/or proceedings given and occurring

16    at the time and place stated in the transcript, a review

17    of which was requested; that I am in no way related to

18    any party to the matter, nor to any counsel, nor do I

19    have any financial interest in the event of the cause.

20        WITNESS MY HAND AND DIGITAL SIGNATURE THIS 8th day

21    of May, 2013.

22

23

24    JULIE R. HEAD, CRR, RPR
      Washington State CCR No. 3119
25    jhead@yomreporting.com
```



YAMAGUCHI OBIEN MANGIO
court reporting, video and videoconferencing
800.831.6973   206.622.6875
production@yomreporting.com
www.yomreporting.com

```
 1              CORRECTION & SIGNATURE PAGE

 2    RE:  COUSINEAU vs. MICROSOFT

 3         USDC AT SEATTLE; No. 11-cv-01438-JCC

 4         SANDEEP DEO; TAKEN APRIL 25, 2013

 5              Reported by: JULIE R. HEAD, CCR No. 3119

 6         I, SANDEEP DEO, have read the within

 7    transcript taken APRIL 25, 2013, and the same is true

 8    and accurate except for any changes and/or corrections,

 9    if any, as follows:

10    PAGE/LINE           CORRECTION              REASON

11    _____

12    _____ " SEE  ATTACHED " _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22         Signed at  REDMOND        , Washington,

23    on this date: 6/7/13

24         _____

25                                     SANDEEP DEO
```



**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973  206.622.6875**
production@yomreporting.com
www.yomreporting.com

| PAGE/LINE | CORRECTION | REASON |
|---|---|---|
| p.7, line 5 | James to Jim | Typo |
| p.16, line 13 | route to crowd | Typo |
| p.16, line 14 | allotted to collected | Typo |
| p.16, line 22 | upon to around | Typo |
| p.26, line 15 | retains to pertains | Typo |
| p.35, line 4 | FMS to ephemeris | Typo |
| p.35, line 13 | FMS to ephemeris | Typo |
| p.37, line 5 | FMS to ephemeris | Typo |
| p.37, line 24 | FMS to ephemeris | Typo |
| p.37, line 24 | core to coarse | Typo |
| p.38, line 4 | find to define | Typo |
| p.38, line 5 | FMS to ephemeris | Typo |
| p.39, line 17 | low to no | Typo |
| p.51, line 15 | turn to enter | Typo |
| p.53, line 12 | at to authorized | Typo |
| p.62, line 18 | man to meaning | Typo |
| p.62, line 22 | delete "mango" | Incorrect |
| p.87, line 1 | packet to package | Typo |
| p.100, line 8 | Missing word "without" between thought and that | Missing |
| p.103, line 10 | totally to talked | Typo |



RECEIVED

JUN 1 0 2013

YAMAGUCHI OBIEN MANGIO, LLC
COURT REPORTING

# EXHIBIT 7

1              UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF WASHINGTON
2                       AT SEATTLE
3

REBECCA COUSINEAU and SAM DUA, )
4    individually on their own      )
     behalf and on behalf of all    )
5    others similarly situated,      )
                                     )
6              Plaintiffs,           )
                                     )
7       vs.                          )    2:11-cv-01438-JCC
                                     )
8    MICROSOFT CORPORATION, a        )
     Delaware corporation,           )
9                                    )
               Defendants.           )
10   _____)
11
12          The deposition of SAMEER DUA, taken on
13    behalf of the defendant in the above-entitled case
14    before Debra L. Kleszyk, a Certified Shorthand
15    Reporter (CSR #084-002981) within and for the
16    State of Illinois, taken on March 13, 2013,
17    commencing at 9:08 a.m. at Edelson, LLC, Suite
18    1300, 350 North LaSalle Street, Chicago, Illinois,
19    pursuant to the Federal Rules of Civil Procedure.
20
21
22
23
24    Job No. CS1627382

1                    A P P E A R A N C E S

2

3    EDELSON, LLC

     350 North LaSalle Street, Suite 1300

4    Chicago, Illinois 60654

     (312) 589-6370

5    BY:  MR. RAFEY S. BALABANIAN

          MR. DAVID MINDELL

6    Rbalabanian@edelson.com

          Appeared on behalf of the Plaintiffs

7

8    DAVIS WRIGHT TREMAINE, LLP

     1201 Third Avenue, Suite 2200

9    Seattle, Washington 98101

     (206) 757-8136

10   BY:  MR. STEPHEN M. RUMMAGE

     steverummage@dwt.com

11        Appeared on behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

1                      I N D E X

2

3    WITNESS:  SAMEER DUA

4    EXAMINATION                              PAGE

5        By Mr. Rummage                         4

6

7

8    DEPOSITION EXHIBITS:  (Attached)

9    NUMBER        DESCRIPTION                 PAGE

10   1             Receipt for phone purchase    31
                   (Bates Cousineau-Dua 000039)

11

     2             Plaintiff's Second Amended    34
12                 Class Action Complaint

13   3             Photograph                    55

14   4             July 23, 2012, electronic     65
                   mail to Sameer Dua from
15                 Ari Scharg

16

17

18

19

20

21

22

23

24

1            (Whereupon, the witness was

2             duly sworn.)

3            SAMEER DUA,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6    EXAMINATION

7    BY MR. RUMMAGE:

8        Q.    Mr. Dua, could you give the court

9    reporter your name and address just for the

10    record?

11        A.    Sure.  My name is Sameer, S-a-m-e-e-r,

12    last name is Dua, D-u-a.  16947 Cedarbrook,

13    C-e-d-a-r-b-r-o-o-k, Drive, the city is Haslett,

14    H-a-s-l-e-t-t, Michigan 48840.

15        Q.    Is that a business or home address?

16        A.    That's my home address.

17        Q.    Okay.  You're a lawyer.  Correct?

18        A.    I am.

19        Q.    Are you admitted to the bar?

20        A.    In Michigan, yes.

21        Q.    Okay.  And what year were you admitted

22    to the bar?

23        A.    2001.

24        Q.    Where did you go to law school?

1   communications with?

2        Q.   Let's say -- let's start with have

3   communications with.

4        A.   Okay.  I first had communications with

5   members of this firm a couple years ago when we

6   were discussing a possible representation of a

7   client from Farmington Hills, Michigan.

8        Q.   And was that client not yourself?

9        A.   No.

10       Q.   Okay.  Somebody else?

11       A.   Correct.

12       Q.   And obviously I don't want to hear

13  anything about privileged information, so please

14  tell me if I'm asking for something that intrudes

15  on attorney-client privilege, either your

16  privilege as a client or your privilege as an

17  attorney, because I don't want either one.

18       A.   I understand.

19       Q.   So can you tell me the general subject

20  matter of the possible representation you were

21  discussing with the firm a couple of years ago?

22       A.   There was a potential for represen-

23  tation in a possible class action lawsuit

24  involving a privacy matter.

1      Q.    And when you say a privacy matter,
2   what aspect of privacy?
3      A.    With regards to violation of certain --
4   certain statutes, if you will.
5      Q.    Okay.
6      A.    Involving a company and this
7   particular client and other people that other
8   firms had already been representing on the same
9   issue.
10     Q.    On the same issue.  Okay.  So
11  obviously the issue is public.  Correct?
12     A.    I believe so.
13     Q.    Okay.  Can you tell me what the issue
14  was then, without disclosing the name of the
15  potential client or the company that was going to
16  be sued?
17     A.    Yes.  I'm attempting to phrase it that
18  way.
19     Q.    Okay.
20     A.    It was our understanding that a
21  particular company may have been illegally, if you
22  will, storing and possibly disseminating
23  information that the potential client was under
24  the assumption that they were either not storing

1    or clearly not disseminating.

2         Q.    And this was personally identifying

3    information?

4         A.    I believe so.

5         Q.    Did it involve location?

6         A.    No, not necessarily.

7         Q.    Was a lawsuit ever brought?

8         A.    Yes.

9         Q.    By whom?  Well, actually let me

10   rephrase the question.  It's a poor question.

11                 Did the client that you were

12   discussing with the Edelson firm ever bring a

13   lawsuit?

14        A.    Yes.

15        Q.    Okay.  And that was filed publicly?

16        A.    Yes.

17        Q.    Okay.  Then I think we can ask the

18   name of the case.

19        A.    Okay.  It's the Netflix case.

20        Q.    And who was the plaintiff?

21        A.    The plaintiff that we were involved

22   with is Eric Weisenberg.

23        Q.    And where was that case brought?

24        A.    That was brought in the Eastern

1    District in Michigan.

2        Q.    Do you know what became of the case?

3        A.    Yeah.  It's in the process of settle-

4    ment now.

5        Q.    Are you counsel of record in the case?

6        A.    We ended up consolidating the case

7    with Edelson.

8        Q.    Okay.  Did you ever appear in the

9    case?  In other words, was your name ever on any

10   pleading or anything of that nature?

11       A.    In the original Eastern District

12   filing.

13       Q.    And the answer is, yes, it was?

14       A.    Yes.

15       Q.    Okay.  By the way, you said that you

16   first communicated with members of the firm a

17   couple of years ago in connection with that

18   matter.

19       A.    Yes.

20       Q.    For Mr. Weisenberg?

21       A.    Mm-hmm.

22       Q.    And, by the way, I don't like going

23   through long instructions, but one thing we do

24   have to make clear, neither you nor I should use

1    "uh-huh" or "uhn-unh," we should use "yes" or

2    "no," because it's indistinguishable in the

3    transcript.

4         A.    I understand.

5         Q.    So your answer to the last question

6    was yes.  Correct?

7         A.    Yes.

8         Q.    So you mentioned that you got in touch

9    with the folks at Edelson a couple years ago in

10   connection with that possible representation.  How

11   did they come to your attention?

12        A.    There's a gentleman who has recently

13   been working in my office who went to school with

14   one of the attorneys here.

15        Q.    All right.  And who was the person who

16   was working in your office?

17        A.    His name is Jeremy Williams.

18        Q.    Does he still work in your office?

19        A.    On a part-time basis.

20        Q.    And who did he go to school with?

21        A.    Ari.

22        Q.    Ari Scharg?

23        A.    Yes.

24        Q.    And, by the way, since we talked a

1      A.    Yes.  And I'm also a partner in some

2  of the entities for which we manage.

3      Q.    And how long have you owned S.S. Asset

4  Management -- or S&S Asset Management?

5      A.    It was originally called S&S

6  Enterprises of Michigan which was started in -- on

7  June 30, 1998, and then later in 2004 I believe we

8  incorporated and changed the name to S&S Asset

9  Management.

10      Q.    And is there another S in the S&S

11  Asset Management?  In other words, I assume one of

12  the S's referred to in that is Sameer.  Correct?

13      A.    Correct.

14      Q.    And is there another S?

15      A.    There is.  My brother, Salil.

16      Q.    Okay.

17      A.    However, when we incorporated -- he

18  was a 50 percent member of S&S Enterprises.  He

19  does not have any interest in S&S Asset Management

20  other than his S in the name.

21      Q.    Okay.  So let's go back to what we

22  were talking about before about the matter

23  involving Mr. Weisenberg and Netflix.

24      A.    Mm-hmm.

1          Q.     Is that a yes?

2          A.     Yes.

3          Q.     Okay.  And you indicated that that was

4     in the settlement process now.  Correct?

5          A.     Correct.

6          Q.     Can you tell me where in the settle-

7     ment process?  Has it been preliminarily approved?

8          A.     We are waiting on the judge's ruling

9     approving the settlement.

10          Q.     Do you know final approval or

11     preliminary approval?

12          A.     I believe it's final that we're waiting

13     for.

14          Q.     All right.  And do you have any

15     arrangements with the Edelson firm with respect to

16     fees in that matter?

17          A.     No, sir.

18          Q.     So you're not going to get any fees

19     out of that?

20          A.     I don't know.

21          Q.     Oh, okay.  So I guess my question was

22     imprecise.  So you don't know whether you have an

23     arrangement with fees?

24          A.     I know that we have no arrangement

1    with fees.

2        Q.    Okay.  Have you put any time in on the

3    case?

4        A.    I have.

5        Q.    Are there any fees being awarded as a

6    consequence of the settlement?

7        A.    I don't know.

8        Q.    Have you seen the settlement agreement?

9        A.    Yes.

10       Q.    And do you recall whether the settle-

11   ment agreement provides for attorney's fees to be

12   paid to anyone?

13       A.    Yes.

14       Q.    To whom does it require the fees be

15   paid?

16       A.    To Edelson it's my understanding.

17       Q.    Okay.  And I may have just asked this

18   question 30 seconds ago, and I apologize if I did,

19   but did you record any billable time on that case?

20       A.    I submitted an invoice.

21       Q.    To whom?

22       A.    To Edelson.

23       Q.    And what was the amount of that

24   invoice?

1      A.    I believe it was around 15,000.

2      Q.    When did you submit that invoice?

3      A.    Probably three, four months ago, maybe

4   a little bit longer.

5      Q.    Have you ever been involved in any

6   other case with the Edelson firm?

7      A.    No, sir.

8      Q.    Obviously other than this one.

9            MR. BALABANIAN:   Can I object just to

10   the -- involved?   I just don't know what you mean

11   by involved.

12            MR. RUMMAGE:   That's a good objection.

13   I was going to move on, but let's go back.

14   BY MR. RUMMAGE:

15      Q.    Have you ever had any discussions with

16   the Edelson firm about any other litigation other

17   than the Weisenberg matter and this matter?

18      A.    Yes.

19      Q.    What other matters have you had

20   discussions about?

21      A.    There are two or three other cases

22   that I had heard that they were investigating, and

23   we are attempting to assist them in finding

24   possible plaintiffs for those cases.

1    Q.    Okay.  When you say you heard they

2    were investigating, how did you hear that?

3    A.    In conversations with my counsel in

4    this case, Edelson obviously, we have had

5    discussions frequently about -- I would ask, "What

6    else is going on?  Do you guys have any interest

7    in cases?"

8    Q.    And who's your contact at Edelson, if

9    you have one, when you have that sort of

10   discussion?

11   A.    Ari and Mr. Mindell.

12   Q.    Did you know Mr. Mindell before he

13   joined the firm?

14   A.    No, sir.

15   Q.    Have you introduced any potential

16   plaintiffs to the Edelson firm other than

17   Mr. Weisenberg or Ms. Cousineau, without giving me

18   their names?

19   A.    Yes.

20   Q.    And when was that?

21   A.    On various occasions over the past

22   year.

23   Q.    Have any of these individuals

24   participated in a lawsuit?

1          A.     Honestly I don't know.

2          Q.     Were any of the individuals that you

3    introduced to the Edelson firm your client?

4          A.     No.

5          Q.     Can you tell me the issues that were

6    involved in the matters with respect to which you

7    introduced these individuals to the Edelson firm?

8               MR. BALABANIAN:  Object to relevance.

9                 You can answer.

10              THE WITNESS:  I can't, because in

11   typical conversation with my counsel they would

12   say, "Do you know anybody who, let's say, utilized

13   this product or had a subscription to such-and-

14   such over this time?"  And I'd say, "I don't know,

15   but I can ask around."  And if I found someone who

16   I thought potentially fit the bill, then I would

17   immediately put that person in contact with

18   Edelson and nothing further from my end.

19   BY MR. RUMMAGE:

20         Q.     Do you have any expectation of

21   compensation as a result of introducing these

22   individuals to the Edelson firm?

23         A.     No, sir.

24         Q.     Have you ever had any discussion about

1    the possibility of compensation?

2          A.    No, sir.

3          Q.    Were any of these individuals -- I

4    think I already asked this question.  None of

5    these individuals were clients of yours?

6          A.    No.

7                MR. BALABANIAN:  Object to form.  It's

8    late.

9    BY MR. RUMMAGE:

10         Q.    So we talked a little bit about your

11   practice.  Can you tell me where your office is?

12         A.    My office is on the south side of

13   Lansing, Michigan.

14         Q.    And I take it that's near Haslett?

15         A.    About 15, 20 minutes.

16         Q.    Okay.  Does Ms. Cousineau work for

17   you?

18         A.    She does.

19         Q.    And does she work for your law firm or

20   does she work for the management company?

21         A.    The law firm has no employees.  She

22   works for the management company.  However, they

23   do share an office.

24         Q.    What does she do for you?

1    leave to use her phone for personal purposes?

2          A.    Absolutely.

3          Q.    Okay.  Do you pay the phone bill for

4    all five employees who have these phones?

5          A.    I do.

6          Q.    Do you know what kind of phones they

7    have?

8          A.    No.

9          Q.    You're obviously aware of this

10   lawsuit.  Correct?

11         A.    Correct.

12         Q.    Okay.  Can you tell me in your own

13   words what the issue is in this lawsuit?

14         A.     In my words, the issue in this lawsuit

15   is simply that the phone that was purchased, upon

16   initial startup you have an option of whether the

17   various companies involved, AT&T and/or Microsoft,

18   can somehow store your information, whether it be

19   location or otherwise.  And if that option is

20   declined, then it's my understanding that it was

21   later found out that that information was being

22   stored anyway.

23         Q.    And when did you first learn about

24   this issue?

 1      A.    August 2011.

 2      Q.    How did you learn about it?

 3      A.    Jeremy in my office -- we don't share

 4  an office, but there's no door in between our

 5  offices.  He was on the phone talking to Ari from

 6  here.  And I overheard something about --

 7  obviously I could only hear Jeremy's end.  I

 8  overheard something about a Windows-based phone

 9  and a little bit about the issue, what I could

10  briefly understand.  I stopped him in mid

11  conversation, I asked him what was going on.  And

12  when he briefed me on what was going on, I said,

13  "Wow.  I need to talk to Rebecca.  I just bought

14  her a similar phone."

15      Q.    And when you say you just bought her,

16  about how long was this after you bought the

17  phone?

18      A.    At first, I had thought it was a few

19  months.  But it -- at first, I thought it was

20  several months, but it turns out it was just about

21  two or three months prior to.

22      Q.    Okay.  And so when you purchased the

23  phone, you're telling me you were unaware of this

24  issue?

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER


I, DEBRA L. KLESZYK, a Certified Shorthand

Reporter of the State of Illinois, CSR License

No. 084-002981, do hereby certify:

That previous to the commencement of the

examination of the aforesaid witness, the witness

was duly sworn by me to testify the whole truth

concerning the matters herein;

That the foregoing deposition transcript

was stenographically reported by me and was there-

after reduced to typewriting under my personal

direction and constitutes a true and accurate

record of the testimony given and the proceedings

had at the aforesaid deposition;

That the said deposition was taken before

me at the time and place specified;

That I am not a relative or employee or

attorney or counsel for any of the parties herein,

nor a relative or employee of such attorney or

counsel for any of the parties hereto, nor am I

interested directly or indirectly in the outcome

1   of this action.

2          IN WITNESS WHEREOF, I do hereunto set my

3   hand at Elk Grove Village, Illinois, this 22nd day

4   of March, A.D., 2013.

5

6   _____

    DEBRA L. KLESZYK

7   Certified Shorthand Reporter

    License #084-002981

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 8

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON

3                       AT SEATTLE

4

5     REBECCA COUSINEAU and SAM DUA,

6     individually on their own behalf

7     and on behalf of all others

8     similarly situated,

9              Plaintiffs,

10                              No. 11-cv-01438-JCC

11        -vs-

12

13    MICROSOFT CORPORATION, a

14    Delaware corporation,

15              Defendant.

16    _____/

17    PAGE 1 TO 16

18    Job No. CS1704652

19         The Deposition of SAMEER DUA,

20         Taken at 7045 S. Cedar Street,

21         Suite 4,

22         Lansing, Michigan,

23         Commencing at 2:00 p.m.,

24         Thursday, August 1, 2013,

25         Before Jennifer L. Ward, CSR-3717.

```
 1    APPEARANCES:

 2

 3    NICK LARRY, ESQ.

 4    RAFEY S. BALABANIAN, ESQ.

 5    Edelson LLC

 6    350 North LaSalle

 7    Suite 1300

 8    Chicago, Illinois 60654

 9    (312) 589-6370

10    nlarry@edelson.com

11            Appearing on behalf of Plaintiffs.

12            (Mr. Balabanian appearing via Speakerphone.)

13

14    STEPHEN M. RUMMAGE, ESQ.

15    Davis Wright Tremaine, LLP

16    1201 Third Avenue

17    Suite 2200

18    Seattle, Washington 98101

19    (206) 622-3150

20    steverummage@dwt.com

21            Appearing on behalf of Defendant,

22            via Speakerphone.

23

24    ALSO PRESENT:  Ben Thomassen, via Speakerphone

25
```

1                    INDEX TO EXAMINATIONS

2

3    WITNESS                                          PAGE

4    SAMEER DUA

5

6    EXAMINATION BY MR. RUMMAGE                         4

7

8

9

10

11

12

13

14                   INDEX TO EXHIBITS

15

16   EXHIBIT                                          PAGE

17

18   (None marked.)

19

20

21

22

23

24

25

1   Lansing, Michigan

2   Thursday, August 1, 2013

3   About 2:01 p.m.

4                        SAMEER DUA,

5   having first been duly sworn, was examined and

6   testified on his oath as follows:

7   EXAMINATION BY MR. RUMMAGE:

8        Q.   Hi, Mr. Dua.  It's Steve Rummage.  You and I

9   met in Chicago several months ago, if you recall?

10       A.   I do.  Good afternoon, Mr. Rummage.

11       Q.   Good morning.  Just for the record, would

12  you please state your name and address?

13       A.   Sameer Dua, 16947 Cedarbrook Drive, Haslett,

14  Michigan, 48840.

15       Q.   And by the way, just to bring us up to

16  speed, I take it Ms. Cousineau still works for you; is

17  that correct?

18       A.   Correct.

19       Q.   Okay.  So you recall we had a deposition

20  previously, correct?

21       A.   I do.

22       Q.   And did you have a chance to read the

23  transcript for that deposition?

24       A.   I did some time ago, yes.

25       Q.   And did you make any corrections to it?  We

BY MR. RUMMAGE:

Q.     So Mr. Dua, in your prior deposition you and
I talked a little bit about your initial contact with
this issue, which was in a conversation you overheard
between Jeremy Williams and Ari Scharg.  Do you
remember that discussion?

A.     Yes.

Q.     And then I said to you, so tell me, after
you heard what you heard, what you overheard in
Jeremy Williams' conversation with Ari Scharg, what did
you do after that, and you said, I contacted Rebecca,
who was at another office.  I don't know if I did it
immediately, but within some time I contacted Rebecca
and I asked her, and at that point Mr. Balabanian
instructed you not to answer.

So I would like to reask that
question, which is, after you overheard that
conversation between Mr. Williams and Mr. Scharg, what
did you do after that and what did you ask
Ms. Cousineau?

A.     I first asked her if she was aware that
somebody could be following her location simply based
on pictures that she was taking.

Q.     All right.  And what did she say?

A.     She said no, she was not aware.

1      A.    Yes.

2      Q.    Do you remember that discussion?

3      A.    Yes.

4      Q.    And is that the picture you sent to Mr. Dua?

5      A.    Yes.

6      Q.    And was that the same day as he first called

7   you?

8      A.    Yes.

9      Q.    All right.  Hold on just one second.  Let

10   me -- and by the way, when Mr. Dua told you that he

11   thought there was an error in the phone that might lead

12   to tracking, what did you understand that to mean?

13      A.    Tracking location.

14      Q.    And when you say tracking, what do you mean

15   by tracking?

16      A.    That -- my understanding would be that they

17   were tracking, yeah, the camera, the use of the --

18      Q.    I see.

19      A.    Okay.

20      Q.    I just want to understand what you mean by

21   the word tracking.

22      A.    My whereabouts.

23      Q.    What did you understand somebody was doing

24   with your whereabouts?

25      A.    That they were tracking my location.

1    it was in that initial conversation or not.

2         Q.    And what is it that she said to you when she
3    did mention it to you?

4         A.    She said that there's this screen that keeps
5    popping up asking about location services or something
6    like that, I don't remember the exact wording that she
7    used, and that she had to keep canceling out of it.

8         Q.    And did she indicate that that was still an
9    ongoing problem?

10        A.    I don't know if she did or not.

11        Q.    So after that first conversation did you
12   have any further conversations with Ms. Cousineau
13   concerning the location issues surrounding the camera?

14        A.    Concerning the location?  I'm sorry, can you
15   repeat that?

16        Q.    Sure.  I thought that was clear enough, but
17   let me go back and see if I can use your words.  You
18   had told her -- or asked her if she was aware someone
19   could be following her location based on the pictures
20   she took, and I'm going to refer to that as the
21   location issue relating to the camera.  Is that okay?

22        A.    Yes, that's okay.

23        Q.    Okay.  So did you have any further
24   discussions with her after that first conversation
25   about the location issue concerning the camera?

1    A.    I believe I did, because the results, if you
2    will, came back almost immediately, and I believe we
3    had another conversation later that same day in which I
4    said yes, in fact it appears, by word of these experts
5    of our attorneys, that someone could still be tracking
6    your location based on the pictures you're taking.
7    Q.    And when you say the experts, do you know
8    who those experts were?
9    A.    I don't.
10    Q.    And without wanting to intrude into the
11    substance of your conversations with the lawyers, I
12    take it when you say the results came back almost
13    immediately, you mean through your lawyers?
14    A.    Correct.
15    Q.    All right.  And after that conversation in
16    which you said -- well, actually, back up for a second.
17    After you told her that the results had come back, what
18    did she say to you?
19    A.    She said something to the effect of what do
20    I do to prevent this.
21    Q.    And what did you say?
22    A.    I said I have no idea.  I said the next
23    thing that you're gonna want to do is get in touch or
24    somehow communicate with the Edelson firm.
25    Q.    All right.  And after that do you know what

1    happened?

2         A.    No.

3         Q.    Did you have any further communications with

4    her about the substance of the lawsuit prior to the

5    filing?

6         A.    Prior to the filing.  No, I did not.

7         Q.    Do you know how quickly the lawsuit was

8    filed after that?

9         A.    I know it was fairly quickly, within --

10   within a day or two.

11        Q.    All right.  And then after the lawsuit was

12   filed, did you have any ongoing dialogue with her about

13   the lawsuit?

14        A.    We had one conversation regarding -- somehow

15   it came about that she Googled her name, and I guess a

16   lot of information came up regarding this lawsuit, and

17   that immediately bothered her with regards to her

18   privacy and her name being all over the Internet in

19   conjunction with this and all that, and so she

20   discussed that with me and asked me if there was gonna

21   be a lot of press involvement and just involvement in

22   general from the media, and I said, you know, I

23   really -- I really don't know, and the best thing you

24   can do is follow up with the Edelson firm regarding

25   that.

1          CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN     )

3                          ) SS

4    COUNTY OF OAKLAND     )

5         I, Jennifer L. Ward, Certified Shorthand Reporter,

6    a Notary Public in and for the above county and state,

7    do hereby certify that the above deposition was taken

8    before me at the time and place hereinbefore set forth;

9    that the witness was by me first duly sworn to testify

10   to the truth, and nothing but the truth, that the

11   foregoing questions asked and answers made by the

12   witness were duly recorded by me stenographically and

13   reduced to computer transcription; that this is a true,

14   full and correct transcript of my stenographic notes so

15   taken; and that I am not related to, nor of counsel to

16   either party nor interested in the event of this cause.

17

18

19   *Jennifer L. Ward*

20                    Jennifer L. Ward, CSR-3717

21                    Notary Public,

22                    Oakland County, Michigan

23

24   My Commission expires:  10-27-2013

25



# EXHIBIT 9

1                  UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF WASHINGTON
2                          AT SEATTLE
3

REBECCA COUSINEAU and SAM DUA, )
4    individually on their own      )
     behalf and on behalf of all    )
5    others similarly situated,      )
                                     )
6               Plaintiffs,          )
                                     )
7        vs.                         )    2:11-cv-01438-JCC
                                     )
8    MICROSOFT CORPORATION, a        )
     Delaware corporation,           )
9                                    )
                Defendants.          )
10   _____)
11
12          The deposition of REBECCA COUSINEAU, taken
13     on behalf of the defendant in the above-entitled
14     case before Debra L. Kleszyk, a Certified
15     Shorthand Reporter (CSR #084-002981) within and
16     for the State of Illinois, taken on March 13,
17     2013, commencing at 11:51 a.m. at Edelson, LLC,
18     Suite 1300, 350 North LaSalle Street, Chicago,
19     Illinois, pursuant to the Federal Rules of Civil
20     Procedure.
21
22
23
24      Job No. CS1627382

```
 1              A P P E A R A N C E S
 2
 3    EDELSON, LLC
      350 North LaSalle Street, Suite 1300
 4    Chicago, Illinois 60654
      (312) 589-6370
 5    BY:  MR. RAFEY S. BALABANIAN
           MR. DAVID MINDELL
 6         MR. BEN THOMASSEN
      Rbalabanian@edelson.com
 7        Appeared on behalf of the Plaintiffs
 8
      DAVIS WRIGHT TREMAINE, LLP
 9    1201 Third Avenue, Suite 2200
      Seattle, Washington 98101
10    (206) 757-8136
      BY:  MR. STEPHEN M. RUMMAGE
11    steverummage@dwt.com
          Appeared on behalf of the Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1                           I N D E X
2
3    WITNESS:  REBECCA COUSINEAU
4    EXAMINATION                                      PAGE
5       By Mr. Rummage                                  5
6
7
8    DEPOSITION EXHIBITS:  (Attached)
9    NUMBER          DESCRIPTION                      PAGE
10   1               Receipt for phone purchase        39
                     (Bates Cousineau-Dua 000039)
11
     2               Plaintiff's Second Amended        36
12                   Class Action Complaint
13   3               Photograph                        84
14   4               (Not referenced)                  --
15   5               Fax containing August 30,         10
                     2011, electronic mail to
16                   Rebecca Cousineau from
                     William C. Gray
17                   (Bates Cousineau-Dua 000081)
18   6               Windows Phone 7 Privacy           81
                     Statement
19                   (Bates MS-COUS_00001177
                     through MS-COUS_00001200)
20
     7               Photograph                        86
21
     8               AT&T Bill                         89
22                   (Bates Cousineau-Dua 000144
                     through Cousineau-Dua 000167)
23
24

1                    I N D E X

2

3    DEPOSITION EXHIBITS:

4    NUMBER       DESCRIPTION                    PAGE

5    9            Photograph                      92

6    10           Plaintiff's Class Action       106
                  Complaint
7                 (Bates Cousineau-Dua 000086
                  through Cousineau-Dua 000099)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          (Whereupon, the witness was

2          duly sworn.)

3          REBECCA COUSINEAU,

4     called as a witness herein, having been first duly

5     sworn, was examined and testified as follows:

6     EXAMINATION

7     BY MR. RUMMAGE:

8          Q.    Ms. Cousineau, could you please state

9     your name and address for the record?

10         A.    Rebecca Cousineau, 2455 North Aurelius

11    Road, K-3, Holt, Michigan, 48842.

12         Q.    And that's your home address?

13         A.    Yes.

14         Q.    What do you do for a living,

15    Ms. Cousineau?

16         A.    I work in the field of property manage-

17    ment.

18         Q.    For whom do you work?

19         A.    For S&S Asset Management.

20         Q.    And that's Mr. Dua's company?

21         A.    That's correct.

22         Q.    How long have you worked for S&S -- is

23    it Asset Management?

24         A.    Asset Management, yes.

1      A.    Not with me right here, no.

2      Q.    Is it here in the office?

3      A.    It is.

4      Q.    All right.  At a break, I would just

5    ask that you just check and see what model phone

6    it is.

7      A.    Absolutely.  Mm-hmm.

8      Q.    So let's talk about your relationship

9    with the Edelson firm.  When did you first have

10    any contact with the Edelson firm?

11      A.    Oh, when I signed the retainer.

12      Q.    Okay.  And had you had any contact

13    with them on any matters prior to the matter that

14    we're here for the deposition?

15      A.    No, sir.

16            MR. RUMMAGE:  All right.  So let's

17    mark this.

18                    (Whereupon, Deposition

19                     Exhibit No. 5 was marked for

20                     identification.)

21    BY MR. RUMMAGE:

22      Q.    The court reporter has just handed you

23    what's been marked as Exhibit 5, Ms. Cousineau.

24    And, can you tell me, is this the letter you were

1    just referring to?

2          A.    Yes, it is.

3          Q.    All right.  And I believe you said

4    that when you signed this was when you first had

5    contact with them.  Is that correct?

6          A.    Yes.

7          Q.    Did you understand when you signed

8    this what issue the Edelson firm was considering

9    pursuing on your behalf?

10         A.    Yes.

11         Q.    What was your understanding of the

12   issue?

13         A.    My understanding of the issue was to

14   retain a class action -- like to be the lead in

15   the case, to be the voice of others.

16         Q.    Okay.  To be the voice of others with

17   respect to what?

18         A.    With respect to having a tracking

19   device in my phone.

20         Q.    And when you say a tracking device,

21   what do you mean?

22         A.    It means when I turn my camera on and

23   I hit "cancel," that it didn't -- that I didn't

24   want to be tracked.  It continued to track me.

1    over again and try to take a different tact, and

2    maybe we'll communicate better.  What I was

3    originally trying to understand is when you

4    retained the Edelson firm and you signed the

5    engagement letter that's marked as Exhibit 5 --

6          A.    Mm-hmm.  Mm-hmm.

7          Q.    -- did you understand that they were

8    going to pursue a claim for something that in your

9    view was wrong?

10         A.    Yes.

11         Q.    Okay.  What was it that was wrong that

12   they were going to pursue a claim for?

13         A.    That they were going to pursue a

14   privacy, like I said, just a privacy.  I mean if I

15   selected "cancel" on my Windows phone, they were

16   going to pursue -- I'm trying to figure this out,

17   just -- they were going to pursue further into any

18   tracking devices.  I guess I'm trying to think --

19   my understanding was there was going to -- I was

20   going to -- it was my camera, my phone --

21         Q.    Right.

22         A.    -- okay, that it was tracked to.  So

23   my understanding at signing this here was to

24   basically -- like I had said, to be the voice of

1    many others that possibly hit "cancel" as well.

2         Q.    Okay.  So what I'm trying to get at is

3    you obviously thought something was wrong.

4         A.    Right.

5         Q.    You wanted lawyers to pursue some-

6    thing.  And so I'm trying to understand when you

7    hit "cancel" what is it that you think happened

8    that you didn't expect to happen.

9         A.    Okay.  I expected that when I hit

10   "cancel" that I would not -- it would not give my

11   exact location.

12        Q.    Okay.  Give your exact location to

13   whom?

14        A.    To anybody.

15        Q.    Okay.  Who did you understand that it

16   did give the exact location to?

17        A.    To whoever was the maker of the phone,

18   the programmer of the phone.

19        Q.    And why did that concern you?

20        A.    Because I'm a very private person.

21        Q.    And in what way would that affect your

22   privacy?

23        A.    Well, I'm a landlord in the city of

24   Lansing, so very -- I mean I don't want everybody

1   to know where I'm at.  I have my quiet time, my
2   privacy time, my alone time.  I don't want every-
3   body to know where I'm at.
4        Q.    And did you have any understanding
5   that people were knowing where you were at, to use
6   your terms, as a result of what you characterize
7   as tracking?
8        A.    One more time, please.
9        Q.    Yes.  It was a bad question, so let me
10  do a better job of it.
11             You just said that your concern is
12  "I don't want anyone to know where I'm at."
13       A.    Mm-hmm.
14       Q.    Correct?
15       A.    That's correct.
16       Q.    And did you have an understanding that
17  whatever was happening with your Windows phone
18  allowed somebody to know where you were at?
19       A.    As long as I hit "cancel," it was my
20  understanding that nobody would know where I was
21  at.
22       Q.    Right.  But then at some point you
23  came to learn that maybe that isn't what happened
24  when you hit "cancel."  Correct?

1     Absolutely I read up on things.

2          Q.     And what have you read up on?

3          A.     I read up on the Windows tracking

4     device hidden in cameras.

5          Q.     What's the tracking device --

6          A.     I'm sorry.  When you select "cancel,"

7     it still is tracking you, where you're at, your

8     precise location.  I've read Huffington Post, I've

9     read PC Magazine, just about anything.

10          Q.     All right.  So when you say it's

11     tracking your precise location, now we're getting

12     back to where we started this, what do you mean by

13     that?  Because I don't understand tracking you.

14          A.     Okay.  I guess for me it means it

15     knows exactly where I'm at.  I mean there's no --

16     yeah, it knows exactly where I'm at, my location

17     when I'm taking photos, yes.

18          Q.     So when you say "it knows exactly

19     where I'm at," what is "it"?

20          A.     It or who.  Whatever is connected to

21     the "cancel" on that button.  If I hit "cancel," I

22     mean Microsoft.

23          Q.     Microsoft?  Is that what you're

24     saying?

1      A.    Yes.

2      Q.    Okay.  So Microsoft knows exactly

3 where you're at?  Is that right?

4      A.    Yes.

5      Q.    And that's your concern?

6      A.    My concern is that anybody knows

7 exactly where I'm at.

8      Q.    So looking again at Exhibit 5, how did

9 you receive this letter from the Edelson firm?

10     A.    Via fax.

11     Q.    And prior to receiving that fax, had

12 you had any contact with the Edelson firm?

13     A.    No.

14     Q.    And how soon after receiving the fax

15 did you sign it?

16     A.    Probably within 30 minutes of

17 receiving the fax.

18     Q.    So you received the fax that day on --

19 well, actually, let's establish this.  In the

20 upper left-hand corner, it has a date and time

21 stamp of August 30, 2011, 13:49.  Do you see that?

22     A.    I do.

23     Q.    Okay.  And this is a fax machine that

24 you commonly used.  Is that correct?

```
 1                    (Whereupon, a break was taken

 2                     from 12:11 p.m. until

 3                     12:14 p.m.)

 4    BY MR. RUMMAGE:

 5         Q.    Let me ask you this, Ms. Cousineau.

 6    When was the first occasion in which you spoke to

 7    somebody from the Edelson firm, just -- not the

 8    contents of what was said, but just when was it

 9    that you first spoke to them?

10         A.    Yesterday.

11         Q.    So you had never actually spoken with

12    a lawyer from this firm before yesterday?

13         A.    No.

14               MR. BALABANIAN:  Just to be clear, are

15    you saying verbal communication?

16               MR. RUMMAGE:  As opposed to sign or

17    what?

18               MR. BALABANIAN:  E-mail.

19               MR. RUMMAGE:  No.  I'm going to ask

20    about e-mail next.

21    BY MR. RUMMAGE:

22         Q.    So you had not spoken to them until

23    yesterday?

24         A.    That's correct.
```

1    phones.  It says tests performed on phone model

2    Samsung Omnia 7.  Do you see that?

3         A.    Okay.

4         Q.    And then the next one says phone model

5    Samsung Omnia 7 below.

6         A.    Mm-hmm.

7         Q.    Is your phone a Samsung Omnia 7?

8         A.    It is.

9         Q.    I'm going to hand you what has been

10   marked Exhibit 1 which was marked in Mr. Dua's

11   deposition which refers to a purchase of what

12   appears to me to be a Samsung 917.  Do you know

13   whether that's the phone that you have?

14        A.    This is the phone, yes.

15        Q.    The one that's on Exhibit 1?

16        A.    That's this one, yes.

17        Q.    The receipt?

18        A.    Yes.  The receipt.  Absolutely.

19        Q.    Why don't we do this, why don't you

20   fire up your phone, if it's on.

21        A.    Okay.

22        Q.    And I'd like you to go to -- do you

23   know how to go to settings?

24        A.    I believe so.  Okay.

1    Q.    Okay.
2              MR. BALABANIAN:  I'm just going to
3    watch what you're doing.
4              THE WITNESS:  Okay.
5    BY MR. RUMMAGE:
6    Q.    So do you know how to click on settings?
7    A.    Yes.
8    Q.    Okay.  Call up settings.
9    A.    Mm-hmm.
10   Q.    Scroll down here at the bottom and
11   you'll see "about."  Do you see that?
12   A.    I do.
13   Q.    And why don't you hit on "about."  And
14   do you see where it says "phone information"?
15   A.    I do.
16   Q.    Can you tell me what it says the phone
17   is?
18   A.    The model is a Samsung SGH I917.
19   Q.    I917.  Okay.  And, actually, do you
20   see where it says "more information"?
21   A.    I do.
22   Q.    Can you hit that?
23   A.    Okay.
24   Q.    Do you see that?

1    A.    I do.

2    Q.    And do you see where it says "software"

3 about the fourth line down?

4    A.    Yes, I do.

5    Q.    What does it say there?

6    A.    Windows Phone 7.5.

7    Q.    Okay.  And did you at some point

8 download new software for your phone?

9    A.    New software like pertaining to any

10 type of software?

11    Q.    Well, did you download a new operating

12 system for your phone?

13    A.    Oh, no.

14    Q.    You never did?

15    A.    No.

16    Q.    So your belief is that the operating

17 system that's on that phone is the operating

18 system that was there when you purchased it?

19    A.    I believe so.

20    Q.    You don't recall ever going to either

21 the Nokia or the Microsoft website and downloading

22 an update?

23    A.    No, I do not recall.

24    Q.    Okay.  You know, as long as we have

1     the phone up, let's look at something else.  Go

2     back to settings where you were before.

3          A.    Okay.

4          Q.    And do you know how to go to "location"?

5     It's about halfway down.

6          A.    Okay.

7          Q.    Do you see that?

8          A.    Let me get back to settings here real

9     quick, please.  Location.

10          Q.    Do you see that?

11          A.    Yes.

12          Q.    Okay.  Can you hit on "location" and

13     call that up?

14          A.    Mm-hmm.

15          Q.    And what does it say there for

16     location services?

17          A.    Off.

18          Q.    And did you turn that off?

19          A.    I mean, yeah.

20          Q.    When did you turn that off?

21          A.    I mean it turned off as far as when I

22     hit the cancel.  I never went into the system

23     settings.

24          Q.    Well, it's turned off at this moment.

1  Is that right?

2      A.    That's correct.

3      Q.    Do you know who turned it off?  Did

4  you or did somebody else?

5      A.    I never turned it off.

6      Q.    But it's turned off now?

7      A.    Correct.

8      Q.    You said you're a very private person?

9      A.    Yes, sir.

10     Q.    Okay.  When you had the phone in your

11 possession, did you leave location on?

12     A.    No.  No.

13     Q.    Did you turn it off?

14     A.    Like I said, I never messed with the

15 settings.  I just went with the initial camera.  I

16 mean when it says "cancel" or "allow," I hit

17 "cancel."  But this is the first time I've been to

18 these settings.

19     Q.    Why is that?  Why did you never visit

20 the settings before?

21     A.    Because I assume that when I hit

22 "cancel" there was no need to visit the settings.

23     Q.    Okay.  Did you ever read any material

24 pertaining to the operation of your Windows phone?

1             After you became aware of this

2    issue, that is your alleged tracking, did you

3    change the settings on the phone?

4         A.    I do not recall.

5         Q.    Okay.  But you just testified a moment

6    ago that you never went into settings and turned

7    off --

8         A.    No.

9         Q.    -- location to your knowledge.  Is

10   that correct?

11        A.    That's correct.  Mm-hmm.

12        Q.    Did you not take pictures after you

13   learned of the issue?

14        A.    Oh, I took pictures.

15        Q.    And you did so knowing that taking

16   pictures would continue to transmit tracking

17   information or location information.  Correct?

18        A.    I guess I -- yes.

19        Q.    Let me ask you a question about the

20   cancel button.

21        A.    Okay.

22        Q.    First of all, you have in front of you

23   that complaint.  That's the legal document I

24   showed you that's got the numbers going down the

1    left-hand side.

2         A.    Uh-huh.

3         Q.    Do you see that?  I want you to turn

4    to that first -- turn over the first page so

5    you're looking at the second page.

6         A.    Okay.

7         Q.    And Paragraph 4 has below it a screen

8    shot that says "Allow the camera to use your

9    location?"  Do you see that?

10        A.    I do.

11        Q.    And is that what you were talking

12   about when you said you hit "cancel"?

13        A.    That is correct.

14        Q.    And, first of all, how many times did

15   you see that screen?

16        A.    You know, actually to the point where

17   there was a couple times that I had seen -- it

18   seemed like it was popping up often and I kept

19   hitting "cancel," "cancel," "cancel."  I was

20   getting frustrated with it actually.

21        Q.    Okay.  And why were you getting

22   frustrated with it?

23        A.    Because in the event of something

24   that's going on, if I have to take a quick photo,

1   I don't want to have to go through this
2   "allow/cancel."  I mean I have people that
3   literally break into apartments.  So if I've got a
4   camera and I'm there, and they do it in broad
5   daylight, I've got photos.  I don't -- I need to
6   grab my photo and take a quick picture.  I don't
7   want to have to fumble around with "cancel" and
8   "allow."
9        Q.    Before you had the phone, what did you
10  use for a camera?
11       A.    I had my camera.
12       Q.    Just a digital camera?
13       A.    Just a digital camera.
14       Q.    And you saw this screen repeatedly.
15  Is that correct?
16       A.    That's correct.
17       Q.    And again you'll see on this screen
18  it's got underscored two words that say "Privacy
19  Statement."  Do you see that?
20       A.    Yes.
21       Q.    Did you ever click on the privacy
22  statement?
23       A.    No.
24       Q.    Why not?

1        A.    I just wanted to hit "cancel."

2        Q.    All right.  And when you say you

3    wanted to hit "cancel," why were you hitting

4    "cancel"?

5        A.    Because I did not want to be -- my

6    pictures and myself located, and I was tired of

7    seeing it keep popping up on my phone.

8        Q.    All right.  Now, why don't you read

9    aloud to me what that says, the screen, that you

10   pushed "cancel" on?

11       A.    Okay.  "Allow the camera to use your

12   location?  Sharing this information will add a

13   location tag to your picture so you can see where

14   your pictures were taken.  This information also

15   helps us provide you with improved location

16   services.  We won't use the information to

17   identify or contact you."

18       Q.    Okay.  So do you know whether the

19   camera ever did use your location?

20       A.    When I was hitting "cancel," no.

21       Q.    Do you know whether the camera ever

22   added a location tag to your pictures?

23       A.    As long as I was hitting "cancel," no.

24       Q.    All right.  And I'm asking, by the

1          MR. BALABANIAN:  Sorry.

2          MR. RUMMAGE:  They, yeah.

3   BY MR. RUMMAGE:

4        Q.    How did they know precisely where you

5   were?

6        A.    How do they know precisely where I'm

7   at?

8          MR. BALABANIAN:  Object to form.

9             You can answer, if you understand.

10         THE WITNESS:  Just through the paper-

11  work, just through the findings.

12         MR. BALABANIAN:  We do have lunch, not

13  to break up the flow.

14                (Whereupon, a lunch break was

15                taken from 12:40 p.m. until

16                1:39 p.m.)

17         MR. RUMMAGE:  We're back on the

18  record.

19             And I just wanted to confirm on

20  the record, and I just had dialogue with

21  Mr. Balabanian about this before we went on the

22  record, that the phone as it exists today is in

23  the state that it existed when it came to the

24  Edelson firm.  In other words, you guys haven't

1  changed the settings, you haven't changed the

2  software, anything of that nature.  Correct?

3            MR. BALABANIAN:  That is correct.  And

4  just to be even more clear, my understanding is

5  the phone was sent straight from my client,

6  Ms. Cousineau, to our experts in Florida silent,

7  and so we did not act as an intermediary in any

8  way.  We received it yesterday, and my firm has

9  opened it for the first time in counsel's

10  presence, opened the package for the first time,

11  and we did not alter it in any way, shape, or

12  form.

13            MR. RUMMAGE:  And, to be clear, the

14  silent instructions were not to alter it either.

15  Correct?

16            MR. BALABANIAN:  Absolutely.

17            MR. RUMMAGE:  Including not to alter

18  the settings?

19            MR. BALABANIAN:  Absolutely.

20  BY MR. RUMMAGE:

21       Q.   I want to go back and reconfirm on the

22  record because something is mystifying to me here.

23  When you go back to the phone, Ms. Cousineau, if

24  you could bring it up again.  And remember we went

1    to settings?

2         A.    Mm-hmm.

3         Q.    Okay.  If you could do that again, go

4    to settings and go to location.  And when you see

5    it -- have you gone into location or are you just

6    looking at it now?

7              MR. BALABANIAN:  She's almost there.

8              THE WITNESS:  Yes.  I'm in there.

9    BY MR. RUMMAGE:

10        Q.    And what you told me is it's off.

11   Correct?

12        A.    That's correct.

13        Q.    But you don't remember turning it off?

14        A.    I do not recall.

15        Q.    And so if I asked you when it was

16   turned off, you wouldn't know the answer to that

17   either?

18        A.    That's correct, I would not know.

19        Q.    Okay.  Let me ask you a somewhat

20   related question, and that is you told me that for

21   a period of time that cancel -- pardon me, the

22   "allow camera to use your location" message popped

23   up repeatedly.  Is that correct?

24        A.    A couple times.  Yes.

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER


I, DEBRA L. KLESZYK, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 084-002981, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome

1    of this action.

2            IN WITNESS WHEREOF, I do hereunto set my

3    hand at Elk Grove Village, Illinois, this 22nd day

4    of March, A.D., 2013.

5

6    _____

              DEBRA L. KLESZYK

7        Certified Shorthand Reporter

              License #084-002981

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Rebecca Cousineau
448 Collingwood Dr. East Lansing, MI 48823
517-749-4156 | 517-272-2866 | RCousineau@ssamgt.com

# fax

| TO: | Ari | FROM: | Rebecca Cousineau |
|---|---|---|---|
| FAX: | 312.589.6378 | PAGES: | 3, including cover |
| PHONE: | | DATE: | 8/30/2011 |
| RE: | | CC: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Comments:

DEPOSITION
EXHIBIT
5

PENGAD 800-631-6989

Cousineau-Dua 000081

**Edelson McGuire, LLC**

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312.589.6370 f 312.589.6378

www.edelson.com

August 30, 2011

**VIA ELECTRONIC MAIL**

Rebecca Cousineau

>        ***Re***:        ***Windows Phone***

Dear Ms. Cousineau:

        I am writing to set out the terms of the retainer agreement through which we will investigate and potentially prosecute the matter involving the Windows Phone privacy matter. By signing this letter-agreement, you will have retained the law firm of Edelson McGuire, LLC as well as such attorneys as may work with us on this case (hereinafter "the lawyers") to represent you in the aforementioned matter. Should we ultimately decide to file suit, our plan is to pursue this matter on your behalf and on behalf of others similarly situated.

        The lawyers will represent both you and the class on a contingent basis. This means that you will not be obligated to pay any of our attorneys' fees or expenses unless we secure some recovery, whether through settlement or judgment or otherwise, whether monetary or otherwise, on behalf of either you or the class.

        Should we achieve a recovery on behalf of a class, we will petition the court for an award of attorneys' fees and expenses. Although the court will determine what to award, you agree that a fair award of attorneys' fees from a fund recovered for the class would be one-third of the total recovery plus reimbursement of all costs and expenses with interest.

        Alternatively, should the court use the lodestar method of awarding fees (number of hours worked times a multiplier), you agree that a fair award of fees would be a lodestar based on our then-current hourly rates with a multiplier of at least three, plus the reimbursement of all our costs and expenses with interest. In no event would you be required to pay us more than half of what we recover for you. If we do not recover any amount on your behalf, you will not be required to pay us any of our fees, costs, expenses or any other amount whatsoever.

        You understand that you may have to produce evidence, either to demonstrate your ability to be an adequate plaintiff, or to support your claims. This may include assisting with answering written discovery, having your deposition taken, giving oral testimony and/or appearing at trial, and possibly producing physical evidence. We understand and appreciate

Illinois / New York / California

Cousineau-Dua 000082

Edelson McGuire, LLC

that you may object to an opposing party's unchecked access to your personal information. We will vigorously oppose the production of any irrelevant personal information and seek protective orders that limit any defendant's access to any evidence that contains confidential information (including attorney-client communications).

You also understand that you have an obligation to preserve evidence, including electronic evidence such as e-mails. You must preserve evidence that common sense would dictate is relevant to your claims. You should conference with us prior to destroying any evidence you believe might be relevant to your claims.

You also agree to provide up-to-date contact information to the lawyers, including your current address, e-mail and telephone number where you can readily be reached.

This agreement is meant to bind and benefit the heirs and successors of each of the parties to this agreement. To that end, you hereby grant the lawyers a lien on any claims, causes of action or recovery that you obtain, whether through settlement, judgment or otherwise, relating to the subject of this agreement. The lien will be based upon the amount of our attorneys' fees, costs and expenses as set forth above. This lien will not apply if we withdraw as your counsel purely out of our own choice.

Rebecca, if you have any questions about any aspect of this letter-agreement, please ask before you sign it. If you do not have any questions, and the agreement is acceptable, please sign and date it in the space provided below. We look forward to working with you.

Sincerely,

_____

William C. Gray, Esq.
Edelson McGuire, LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654
(312) 589-6370
(312) 589-6378 fax

Agreed to: *Rebecca Cousineau*                    *August 30, 2011*
Rebecca Cousineau                                August 30, 2011

Cousineau-Dua 000083

# EXHIBIT 10

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4

5      REBECCA COUSINEAU and SAM DUA,

6      individually on their own behalf

7      and on behalf of all others

8      similarly situated,

9              Plaintiffs,

10                              No. 11-cv-01438-JCC

11         -vs-

12

13     MICROSOFT CORPORATION, a

14     Delaware corporation,

15             Defendant.

16     _____/

17     PAGE 1 TO 33

18     Job No. CS1704652

19          The Deposition of REBECCA COUSINEAU,

20          Taken at 7045 S. Cedar Street,

21          Suite 4,

22          Lansing, Michigan,

23          Commencing at 1:00 p.m.,

24          Thursday, August 1, 2013,

25          Before Jennifer L. Ward, CSR-3717.

1   APPEARANCES:

2

3   NICK LARRY, ESQ.

4   RAFEY S. BALABANIAN, ESQ.

5   Edelson LLC

6   350 North LaSalle

7   Suite 1300

8   Chicago, Illinois 60654

9   (312) 589-6370

10  nlarry@edelson.com

11          Appearing on behalf of Plaintiffs.

12          (Mr. Balabanian appearing via Speakerphone.)

13

14  STEPHEN M. RUMMAGE, ESQ.

15  Davis Wright Tremaine, LLP

16  1201 Third Avenue

17  Suite 2200

18  Seattle, Washington 98101

19  (206) 622-3150

20  steverummage@dwt.com

21          Appearing on behalf of Defendant,

22          via Speakerphone.

23

24  ALSO PRESENT:  Ben Thomassen, via Speakerphone

25

INDEX TO EXAMINATIONS

WITNESS                                              PAGE

REBECCA COUSINEAU


EXAMINATION BY MR. RUMMAGE                              4


INDEX TO EXHIBITS


EXHIBIT                                              PAGE


(None marked.)

1    Lansing, Michigan

2    Thursday, August 1, 2013

3    About 1:00 p.m.

4                    REBECCA COUSINEAU,

5    having first been duly sworn, was examined and

6    testified on her oath as follows:

7    EXAMINATION BY MR. RUMMAGE:

8        Q.    Hi, Ms. Cousineau.  This is Steve Rummage on

9    the phone, and you and I have met before, correct?

10       A.    Yes, that's correct.

11       Q.    And I just want to, for the record, ask you

12   to state your name and address again?

13       A.    Rebecca Cousineau, 2455 North Aurelius Road,

14   Apartment K3, Holt, Michigan, 48842.

15       Q.    By the way, how close is Holt to Lansing,

16   Michigan?

17       A.    Probably not even -- I could walk here.

18   Less than half a mile.

19       Q.    Okay.  So pretty close?

20       A.    Yes.

21       Q.    Okay.  You recall, Ms. Cousineau, that you

22   and I met previously in Mr. Balabanian's office where

23   you gave testimony in connection with this matter?  Do

24   you recall that?

25       A.    Yes, I do.

1    from who, and you said from Sam, and I said, and what

2    did Sam say to you, and Mr. Balabanian instructed you

3    not to answer.

4                        So I'd like to reask that question.

5    When Mr. Dua first called you about the phone issue,

6    can you tell me what he told you?

7                        MR. BALABANIAN:  And I'd like to

8    assert an objection based on attorney/client privilege.

9    Rebecca, you can go ahead and answer the question.

10                       THE WITNESS:  I received a phone

11   call.  Sam had overhead Jeremy talking to somebody

12   on the phone, and he had called me and told me that

13   he -- there was a possibility that there was a problem

14   with the camera phone, and it was tracking, and if I

15   wanted to take a picture and send it to him, and I said

16   yes, I did, because I clearly recall having issues with

17   the cancel button at that time.  So I did take a

18   picture --

19   BY MR. RUMMAGE:

20        Q.    And what were the issues -- go ahead.  I'm

21   sorry.

22        A.    I did take a picture and send it to him.

23        Q.    All right.  Now, earlier in your deposition

24   we actually talked about a particular picture that you

25   took of a bulletin board in one of the apartments?

1    A.    Yes.

2    Q.    Do you remember that discussion?

3    A.    Yes.

4    Q.    And is that the picture you sent to Mr. Dua?

5    A.    Yes.

6    Q.    And was that the same day as he first called

7  you?

8    A.    Yes.

9    Q.    All right.  Hold on just one second.  Let

10  me -- and by the way, when Mr. Dua told you that he

11  thought there was an error in the phone that might lead

12  to tracking, what did you understand that to mean?

13    A.    Tracking location.

14    Q.    And when you say tracking, what do you mean

15  by tracking?

16    A.    That -- my understanding would be that they

17  were tracking, yeah, the camera, the use of the --

18    Q.    I see.

19    A.    Okay.

20    Q.    I just want to understand what you mean by

21  the word tracking.

22    A.    My whereabouts.

23    Q.    What did you understand somebody was doing

24  with your whereabouts?

25    A.    That they were tracking my location.

1    Q.    I'd like you to answer the question, if it's
2    possible, without using the word tracking, because I
3    don't know what you mean when you say tracking, and I'm
4    trying to understand what you mean when you say
5    tracking.  What do you think somebody was doing with
6    your location?
7    A.    That it was -- they were knowing precisely
8    where I was at, at exactly precisely the time and
9    place.
10   Q.    And when you say they, who did you have in
11   mind was knowing precisely where you were at?
12   A.    They meaning the makers, Microsoft.
13   Q.    And you said that in response to that you
14   did send him a picture; is that correct?
15   A.    Yes.
16   Q.    And you also said that prior to that time
17   you remember having issues with the cancel button; is
18   that correct?
19   A.    Yes.
20   Q.    And what issues had you had?
21   A.    Prior to taking a photo, the camera
22   application would throw up a yes or a no, and I would
23   select no, and it just seemed like every time I used
24   the phone it kept throwing that up at me and I just
25   kept having to hit no.

1          Q.    Okay.  And I'm curious, when you say hit no,
2    did you hit the word cancel or did you hit the little
3    back arrow button at the bottom of the phone?  Do you
4    know?
5          A.    I don't recall.
6          Q.    Okay.  Now, when we talked during your prior
7    deposition, we talked about the picture that you sent
8    to Mr. Dua.  Do you remember discussing that in your
9    prior deposition?
10         A.    Vaguely.
11         Q.    Okay.  Do you have the transcript in front
12   of you?
13         A.    Yes, sir.
14         Q.    Could you turn to page 86 in the transcript?
15         A.    Okay.  Okay.
16         Q.    And you can go back a page if you want,
17   but you'll see that Exhibit 7 is marked for
18   identification at that page, and we talk about the
19   picture and the date of August 30th, 2011 and the time
20   being 12:43 p.m. when that was taken.  Is that the
21   picture that you're talking about now?
22         A.    Yes.
23         Q.    And so does that mean that August 30, 2011
24   is the date when Mr. Dua first called you?
25         A.    I believe so.  I'm not sure.  Yes.

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN    )

3                         ) SS

4    COUNTY OF OAKLAND    )

5         I, Jennifer L. Ward, Certified Shorthand Reporter,

6    a Notary Public in and for the above county and state,

7    do hereby certify that the above deposition was taken

8    before me at the time and place hereinbefore set forth;

9    that the witness was by me first duly sworn to testify

10   to the truth, and nothing but the truth, that the

11   foregoing questions asked and answers made by the

12   witness were duly recorded by me stenographically and

13   reduced to computer transcription; that this is a true,

14   full and correct transcript of my stenographic notes so

15   taken; and that I am not related to, nor of counsel to

16   either party nor interested in the event of this cause.

17

18

19   _____

20                   Jennifer L. Ward, CSR-3717

21                   Notary Public,

22                   Oakland County, Michigan

23

24   My Commission expires:  10-27-2013

25



**EXHIBIT 11**

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4    REBECCA COUSINEAU and SAM      )

5    DUA, individually on their    )

6    own behalf and on behalf      )

7    of all others similarly       )

8    situated,                     ) Case No.

9         Plaintiffs,              ) 2:11-cv-01438-JCC

10   vs.                           )

11   MICROSOFT CORPORATION, a      )

12   Delaware corporation,         )

13        Defendant.               )

14

15          The deposition of CRAIG SNEAD, called

16   for examination, taken pursuant to the Federal

17   Rules of Civil Procedure of the United States

18   District Courts pertaining to the taking of

19   depositions, taken before CARIANN BILLS, CSR

20   No. 084-003836, a Shorthand Reporter within and for

21   the County of Cook, State of Illinois, at

22   Suite 1300, 350 North LaSalle Street, Chicago,

23   Illinois, on the 22nd day of August, A.D. 2013 at

24   9:10 a.m.

```
1   PRESENT:

2          EDELSON, LLC,

3          (350 North LaSalle Street, Suite 1300,

4          Chicago, Illinois 60654,

5          312.589.6370), by:

6          MR. BENJAMIN H. RICHMAN,

7          brichman@edelson.com,

8          MR. DAVID MINDELL,

9          dmindell@edelson.com,

10             Appeared on behalf of the Plaintiffs;

11

12         DAVIS WRIGHT TREMAINE, LLP,

13         (1201 Third Avenue, Suite 2200,

14         Seattle, Washington 98101

15         206.622.3150) by:

16         MR. STEPHEN M. RUMMAGE,

17         steverummage@dwt.com,

18             Appeared on behalf of the Defendant.

19

20  Also Present:

21  Mr. Amir Missaghi, Edelson Associate

22

23  REPORTED BY:  CARIANN BILLS C.S.R.

24               CERTIFICATE NO. 084-003836
```

1                         I N D E X

2    WITNESS                          EXAMINATION

3    CRAIG SNEAD

4    By Mr. Rummage                          4

5

6

7                    E X H I B I T S

8    NUMBER                               PAGE

9    No. 1  subpoena                        4

10   No. 2  report                          4

11   No. 3  resume

12

13

14

15

16

17

18

19

20

21

22

23

24

1          (WHEREUPON, certain documents were

2          marked Snead Deposition Exhibit

3          Nos. 1 and 2, for identification.)

4          (WHEREUPON, the witness was duly

5          sworn.)

6          CRAIG SNEAD,

7    called as a witness herein, having been first duly

8    sworn, was examined and testified as follows:

9          EXAMINATION

10   BY MR. RUMMAGE:

11        Q.    Good morning, Mr. Snead.  How are you?

12        A.    I'm fine.  How are you?

13        Q.    I couldn't be better.

14        All right.  Could you please take a look

15   at what the court reporter has marked as Exhibit 1.

16   It should be the subpoena directed to you.

17        Do you have that in front of you?

18        A.    I do.

19        Q.    Have you ever seen that before?

20        A.    I have.

21        Q.    How long ago did you first see it?

22        A.    I saw it last night.

23        Q.    Did you bring with you any documents in

24   response to that subpoena?

1   BY MR. RUMMAGE:

2       Q.      Did you read the deposition testimony of

3   Ms. Cousineau?

4       A.      No.

5       Q.      Did you read the deposition testimony of

6   Mr. Dua?

7       A.      Does not sound familiar.  I don't think

8   so.

9       Q.      What kind of phone do you own?

10      A.      I own an iPhone.

11      Q.      Have you ever owned a Windows phone?

12      A.      I have.

13      Q.      Which Windows phone did you own?

14      A.      I had a Samsung Focus S.

15      Q.      Do you know which version of the Windows

16  phone software that had?

17      A.      I don't recall.

18      Q.      Do you recall the time period during

19  which you owned it?

20      A.      I don't, to be honest.  I only had it

21  for a couple of months.

22      Q.      Can you give me a year?

23              I mean, was it a year ago?  Two years

24  ago?  Five years ago?

1  camera and what was his answer?

2  BY THE WITNESS:

3       A.    I'll make it easy.  I did use the

4  camera.

5  BY MR. RUMMAGE:

6       Q.    Do you know how you responded to the

7  dialogue box that popped up asking you whether you

8  wanted to allow the camera to tag the pictures?

9       A.    I don't recall but can tell you from my

10  experience with that and other phones, I usually do

11  not allow it.

12       Q.    But you don't recall in this instance?

13       A.    I don't recall in this instance but

14  likely -- I likely clicked cancel.  I don't usually

15  allow pictures being geotagged.

16       Q.    Why is that?

17       A.    Personal preference.

18       Q.    So did you ever -- this may be implicit

19  in the time period, but did you ever test your

20  Windows phone to see whether the issues involved in

21  this lawsuit were also issues with your phone?

22       A.    I did not.

23       Q.    Did you ever test Ms. Cousineau's phone?

24       A.    I did not.

1  Framework, that is a portion of the software,

2  correct?

3       A.    Yes, it is like a -- it's like a subset

4  of software that basically is designed to interact

5  with the user.  It's designed to pull back the user

6  location.

7       Q.    In response to calls, right?

8       A.    Yes.

9       Q.    In response to calls made by other

10 applications or portions of the software?

11      A.    Correct.

12      Q.    Okay.  So when you say Location

13 Framework is accessing the RAM, are you saying that

14 Microsoft is accessing the RAM?

15      A.    Well, the code that Microsoft wrote is

16 accessing RAM.

17      Q.    But not Microsoft itself?

18      A.    I don't really understand the

19 distinction.

20      Q.    Well, let's put it this way.  Is

21 somebody at Microsoft able to get at the RAM as a

22 result of the process you described here?

23      A.    It depends if they write a piece of code

24 that accesses that RAM.  If they did and they are

1   that concept?

2          A.    I do.

3          Q.    Okay.  So are you telling me that if I

4   press "J" and "J" appears in my file, you have

5   written that into my file?

6          A.    The software has written that into a

7   file.

8          Q.    And the software is something you wrote,

9   correct?

10         A.    Correct.

11         Q.    So what you're saying here is that

12  Location Framework, a piece of software accesses

13  the RAM, correct?

14         A.    Yes.

15         Q.    And you're saying Microsoft wrote the

16  software that accesses the RAM, correct?

17         A.    Correct.

18         Q.    And you're not saying that somebody at

19  Microsoft back in Redmond or wherever they are is

20  actually getting into the RAM and looking at it?

21         A.    It's not a physical person, no.  It's a

22  process.

23         Q.    And the process, in this instance that

24  you are talking about, is currently on the phone,

1    correct?

2         A.    Correct.

3         Q.    Nothing is being sent back to the

4    servers, as far as you could tell, when Location

5    Framework accesses the RAM?

6         A.    That's difficult to answer that question

7    because there is a process in which the RAM is

8    accessed.   And if, for instance, it doesn't find it

9    in RAM, then it would be.

10        Q.    But that's if it doesn't find it in RAM,

11   correct?

12        A.    Correct.

13        Q.    We're going to go through that in

14   detail.

15        A.    Okay.

16        Q.    So that's what I wanted to understand.

17              So when you say at page 14, the mobile

18   device's RAM is accessed, you are saying it's

19   accessed by the Location Framework on the phone,

20   correct?

21        A.    Yes.

22        Q.    All right.  By the way, can Windows

23   phone device, can that transmit communications?

24        A.    Can it transmit?

1      A.    Correct.

2      Q.    And if I am somebody who's using my

3  phone and I access an application and I ask it to

4  resolve location and it resolves location and I get

5  a fix, is there any way I can tell whether my phone

6  has done that using Orion or done it using

7  information held locally on the device?

8      A.    As far as Wi-Fi cell resolution or a

9  GPS?

10     Q.    Wi-Fi cell resolution.

11     A.    As far as Wi-Fi cell resolution, I don't

12  think you would notice.  I don't think there is a

13  difference to the end user.

14     Q.    You distinguish that from GPS.

15          And would I be able to tell if I was

16  getting a GPS fix distinct from a Wi-Fi cell

17  resolution?

18     A.    I don't recall exactly how the Windows

19  phone UI looks whenever you are receiving GPS but a

20  lot of times in a lot of different phones you will

21  see an indication of whether your GPS is on.

22          And, basically, yeah, I mean, you can

23  see an indication that it's using GPS.

24     Q.    But you don't know whether that's true

1  next series of questions -- what the function of

2  the tile is?  In other words, why are tiles loaded

3  onto the phone?

4      A.    So my understanding is the function of

5  tiles is to basically allow resolution of the

6  user's location based on places where -- based on

7  Beacons that are known essentially.

8           So you've got a cell phone tower and

9  it's got this static latitude and longitude, and

10  you have that loaded into your tile.  You can

11  basically triangulate based on where these Beacons

12  contained in this tile are.

13      Q.    And the tile --

14      A.    The Beacons that you have available to

15  you.

16      Q.    And the point is that the tile is on the

17  phone, correct?

18      A.    It is on the phone after being

19  downloaded from the service.

20      Q.    Exactly.

21           And so if you have a tile that covers

22  the Beacons you are talking about, you don't have

23  to go to service, correct?

24      A.    Correct.

1    that the process works.

2         Q.    Well, I thought that you told me earlier
3    that if location can be resolved on the device, an
4    inference request isn't sent to Orion; is that
5    right?

6         A.    As I remember it, potentially, yes.    I
7    believe -- I believe so.    Yeah, if it's in memory,
8    it's mapped in memory, then, yes, an inference
9    request would not be sent to the server.

10         Q.    All right.    And would an inference
11    request be sent to the server if there are no
12    Beacons visible?

13         A.    Yes, I believe so.

14         Q.    Even if there are no Beacons?

15         A.    I believe so.    It would have to -- it
16    would basically, yeah, I believe so.

17         Q.    What would it send to the server?

18         A.    I am sorry.    Let me change my answer.

19              Yeah.    So no Beacons available would
20    generate -- I can't remember.    I am trying to
21    remember the source code now.    No Beacons available
22    would -- I would have to review the source code.
23    Again, I am trying to remember what happens if no
24    Beacons are available.

1       Q.    Do you have the source code in front of

2  you?

3       A.    I have pieces of source code.

4       Q.    You don't know one way or the other?

5       A.    I don't know one way or another if it's

6  in there.

7       Q.    But at least you agree with me that if

8  it's resolved entirely locally in RAM, for

9  example --

10      A.    Right.  It will use RAM.  I guess it

11  would not -- it would not send an inference

12  request.  It would essentially send a data

13  collection request.

14      Q.    A data collection request?

15      A.    Data collection report, correct, if I

16  remember correctly.

17      Q.    Okay.  And what does it generate the

18  data collection report from, RAM?

19      A.    Yeah, basically from how it resolved in

20  RAM.

21      Q.    Okay.  And do you have any understanding

22  of how frequently inference requests are resolved

23  on RAM as distinct from being resolved with a call

24  to the servers?

1    visible.

2        Q.    When you said "providers," what do you

3    mean?

4        A.    A provider in my understanding is a

5    component of software that deals specifically with

6    one type of a resolution.  Like there would be a

7    Wi-Fi provider, a cell provider.  So those two

8    would be two different things.  You would have

9    Wi-Fi Beacons that the Wi-Fi provider would

10   triangulate.  You have the cell Beacons for the

11   cell phone provider.

12       Q.    So when you say provider in that

13   context, you're not talking about some third-party

14   provider?

15       A.    Correct.  It's a code -- provider in

16   code.  I think that's actually what Microsoft calls

17   them in their code, Wi-Fi cell provider or

18   whatever.

19       Q.    Exactly.  So when you say the geometric

20   calculation is performed, you are saying it's

21   performed by the software, correct?

22       A.    That is correct.

23       Q.    On the device, correct?

24       A.    That's correct.

1      Q.    Without having to go out to any
2    third-party?
3      A.    That is correct.
4      Q.    And without having to go back to
5    Microsoft's server?
6      A.    Once it's on the device -- once the tile
7    is on the device, that is correct.
8      Q.    Okay.  So look at the diagram that's
9    there in the middle of page 6 and I just want to
10   understand a couple of concepts that you have --
11   really one concept that is noted there and
12   understand what your understanding of it is.
13         Right below in that diagram, right below
14   the box that has the triangle saying, Current
15   Location in it, there is text that says, Denotes
16   location tested for adjacent tile to be prefetched
17   or loaded.
18         Do you know what that means?
19     A.    It's visible and it's in a different --
20   like, basically the location is visible and has
21   been resolved and it's in a different tile that
22   needs to be pulled from Orion.  It's not on the
23   device.  It needs to be pulled, essentially.
24     Q.    So it's not the current location,

1      Q.      That goes where?

2      A.      That goes -- that is uploaded in batches

3   to Microsoft.

4      Q.      And when you say a "data collection

5   report," are you now talking about the crowd

6   sourcing?

7      A.      Yes.

8      Q.      So that has to do -- we'll get to that

9   later but for crowd sourcing, you have to have a

10  GPS fix, correct?

11     A.      Potentially I would have to review

12  again.

13     Q.      Leave aside for a second the crowd

14  sourcing.  All right?

15     A.      Okay.

16     Q.      And let's just talk about the resolving

17  of the location.

18     A.      Okay.

19     Q.      If location is resolved purely through

20  RAM without going through flash, without going to

21  Orion, there is no data downloaded to Orion,

22  correct, in connection with the location reference

23  request?

24     A.      That is my understanding.

1      A.    I believe there is.  I believe it's
2  whenever you turn the master location switch on --
3  I am going from memory here.  I'm not 100 percent
4  sure on this, but I believe that you say, okay,
5  you're going to help Microsoft improve their
6  location services, which is from what I understand
7  from crowd sourcing.
8      Q.    And you are saying that that's in
9  connection with the location switch, the master
10 switch?
11     A.    Yes.
12     Q.    Okay.  What I'm actually asking,
13 Mr. Snead, is not whether at the outset you have to
14 consent or what disclosure is made at the outset.
15 I am asking whether physically as crowd sourcing is
16 going on whether a user is going to see any
17 anything on the device that will alert them to the
18 fact that it's going on?
19     A.    A user, from what I understand, would
20 not see.
21     Q.    Would a user know whether location was
22 obtained using GPS?
23     A.    Again, I believe that there is an icon
24 on Windows phone, but I don't know 100 percent.

1    starts saying, Resolve my location.  Then it sits

2    there and waits until it gets a report back.  It

3    waits.  When it gets the report back, offset into

4    cache, ready so the camera application has it ready

5    and then sits there and waits again.

6              So if you had the camera sitting up in

7    front of you, it was doing this stuff in the

8    background so it's ready with a cached location

9    ready to geotag.

10    Q.    Okay.  Why don't you read back my

11   initial question just to make sure that we're in

12   the same context.

13              (WHEREUPON, the record was read by

14              the reporter.)

15   BY MR. RUMMAGE:

16        Q.    So that question -- bearing that

17   question in mind, you just described to me that the

18   call is made to Framework and Framework essentially

19   returns a result to the camera, correct?

20        A.    Got you.

21        Q.    And the result that's returned to the

22   camera doesn't necessarily require a call to

23   Microsoft server?

24        A.    I'll give you that because it could --

1    as we have gone over before, it could resolve a

2    location in RAM once it gets back from the --

3        Q.    All right.  That's what I wanted to make

4    clear.

5        A.    Okay.

6        Q.    And, in fact, just to button up another

7    aspect of what we talked about before you talked

8    about how in addition to that question of returning

9    data to the camera for purposes of resolving

10   location, there is also the question of crowd

11   sourcing, correct?

12       A.    Yes.

13       Q.    And in some instances where there is a

14   GPS fix, there may be a data report that's stored

15   to the phone and then eventually downloaded to

16   Orion, correct?

17       A.    Yes.

18       Q.    But we also agree that's not always

19   going to happen either, correct?

20       A.    Yes, it's not always going to happen.

21       Q.    All right.  And do you know of any way

22   to tell for a particular user, like, for example,

23   back when you had Windows phone 7 whether that

24   happened or not, that is the crowd sourcing?

1        A.    I do.

2        Q.    And when that function attempts to

3   resolve location, is that done before a call is

4   made to Orion?

5        A.    Yes, it is.

6        Q.    And what happens if that attempt to

7   resolve the user's location by accessing RAM is

8   successful?

9        A.    If it's successful, it returns the

10  report which then returns the location that was

11  resolved by RAM.

12       Q.    Okay.  And returns it where?

13       A.    To the calling application.

14       Q.    Okay.  And does it return anything to

15  Microsoft servers in that scenario from RAM?

16       A.    I don't recall.  I don't think so.

17       Q.    Did you say I don't think so?

18       A.    I don't think so.

19       Q.    And then you say, again, the same page,

20  line 24, you say, If the mobile device's location

21  cannot be resolved from data in RAM, i.e., there

22  is no Beacon data loaded in RAM or no matches are

23  found, an asynchronous call to Orion is made via

24  the ResolveLocation Via WebServer function.

1    A.    Right.

2    Q.    And so that means, as I understand, that

3    the call to Orion is made only if data is not found

4    in RAM sufficient to resolve location; is that

5    right?

6    A.    That is my understanding.

7    Q.    And are you aware how often it's

8    resolved one way versus the other?

9    A.    I can't -- I don't know.

10    Q.    And would you agree that when you look

11    at how the source code is set up and how the

12    software is designed, would you agree that the

13    preference in the source code is to resolve in RAM

14    if you can?

15    A.    If it's possible.  It's the first line

16    of defense, so, yes.  They would probably prefer to

17    resolve in -- in RAM if they can.

18    Q.    Okay.  So if you can't resolve in RAM,

19    then what happens?

20    A.    Then it basically constructs a header to

21    send to Orion, an XML SOAP.

22    Q.    But then you said --

23    A.    SOAP.  SOAP is another acronym, S-O-A-P

24    that is sent to a web service and basically it's a

1    people it might not, right?

2         A.    It's possible.

3         Q.    I want to read you a statement and ask

4    you whether based on your review the statement is

5    true.

6              Windows phone 7 location functionality

7    works by temporarily storing data concerning a

8    user's recent location in each phone's random

9    access memory which Microsoft would then access as

10   needed upon request by an application including

11   camera.  Is that true?

12        A.    Based on my review of the source code,

13   yeah, it seems like a true statement.

14        Q.    Just so I understand where it says,

15   "Microsoft would access that information as

16   needed," in what way does Microsoft access that

17   information?

18        A.    Microsoft is the creator of the source

19   code, so it seems like a true statement to me.

20        Q.    Okay.  So you mean that the source code

21   that is the software accesses the information,

22   correct?

23        A.    Right, which was created by Microsoft.

24   So in turn it's an A-plus-B-equals-C kind of thing.

1  So it's Microsoft.

2      Q.    So if going back to the analogy we

3  talked about where you have written a software for

4  word processing and I used that software, if I type

5  a document, would you agree with me that in that

6  scenario, you would say you have created the

7  document?

8      A.    If you are creating a Word document?

9      Q.    And you are the author of Word.  You are

10  the person who created Word.  So you have created

11  that document.

12      A.    Yeah.  You create a document.

13      Q.    So what I mean is the creator of the

14  software is actually the person who has created

15  that document?

16      A.    But you have control of that document.

17  The creator of the software has given you the means

18  to create a document and it's separate from

19  software development, in my opinion.

20      Q.    Okay.  So going back to the statement

21  that I read to you that is Microsoft would then

22  access RAM as needed, you are saying the software

23  would access RAM as needed to resolve location,

24  correct?

1    A.    Okay.

2    Q.    Is that right?

3    A.    Yeah, the software written by Microsoft

4    accesses the RAM.

5    Q.    And that the fact that software written

6    by Microsoft accesses the RAM, I believe you agree

7    with me, doesn't necessarily mean that information

8    is transmitted to Microsoft or anywhere else off

9    the device?

10    A.    If -- in certain circumstances, yes.

11    Q.    That's why I said necessarily.

12    A.    Okay.

13    Q.    So it doesn't always mean that, correct?

14    A.    I believe that's correct.  But, again,

15    I'm not 100 percent sure if there are not other

16    ways other logs are kept.  I can't remember.

17    Q.    As you sit here today, you don't have

18    any recollection?

19    A.    No recollection.  Yeah.

20    MR. RUMMAGE:  Why don't we take a break.

21                (WHEREUPON, a break was taken.)

22                (WHEREUPON, a certain document was

23                marked Snead Deposition Exhibit

24                No. 3, for identification.)

1    part of your answer.

2         A.    Piggybacking those data observations off

3    the phone --

4         Q.    Right?

5         A.    -- on to other requests when you are not

6    connected to Wi-Fi, when you are on cell data.

7         Q.    Okay.  But what if there are no requests

8    being made to piggyback on?

9         A.    So if there is -- I guess if there is no

10   request, then you can't piggyback, to be honest.

11              But, again, I don't remember the exact

12   trigger but I do know that that max function kind

13   of makes sense if it's -- if you are making a

14   request and that queue of observations is large,

15   then you start piggybacking those off.

16        Q.    But you don't have any reason to

17   disagree with her comment about losing that data

18   if, for example, the phone runs out of battery or

19   the phone is shut off?

20        A.    I do remember seeing that the max number

21   of observations -- I do believe that they were

22   replaced kind of a first-in/first-out type of

23   thing.

24        Q.    Okay.  My question was different.  My

1    question was whether you disagreed with her

2    observation that you would lose the data if the

3    phone was turned off or ran out of battery?

4        A.    I guess I have nothing that I remember

5    that would cause me to disagree with that.

6        Q.    Okay.  I want you to turn to page 10 of

7    your report, line 17.  That's where you talk about

8    the values of the dialogue.  Do you recall

9    testifying about that?

10       A.    I do recall.

11       Q.    And based on your review of the source

12   code, did you see any way in which the dialogue

13   would reappear after the user chose cancel?

14       A.    I believe we talked about this.  The

15   only thing that we talked about was it's possible

16   that either, A, the registry write was unsuccessful

17   or, B, it's possible that they backed out of that

18   dialogue without hitting either one of those

19   buttons.

20       Q.    So B talks about neither button was hit.

21             I am talking about if the button cancel

22   was hit, is there any reason you can think of why

23   the dialogue would reappear?

24       A.    Something goes wrong with writing the

1  STATE OF ILLINOIS )

2                    )

3  COUNTY OF COOK    )

4

5        I, CARIANN BILLS, a Certified Shorthand

6  Reporter, within and for the County of Cook, State

7  of Illinois, do hereby certify:

8        That previous to the commencement of the

9  examination of the witness, the witness was duly

10 sworn to testify the whole truth concerning the

11 matters herein;

12       That the foregoing deposition transcript

13 was reported stenographically by me, was thereafter

14 reduced to typewriting under my personal direction

15 and constitutes a true record of the testimony

16 given and the proceedings had;

17       That the said deposition was taken

18 before me at the time and place specified;

19       That I am not a relative or employee or

20 attorney or counsel, nor a relative or employee of

21 such attorney or counsel for any of the parties

22 hereto, nor interested directly or indirectly in

23 the outcome of this action.

24       IN WITNESS WHEREOF, I do hereunto set my

1  hand at Chicago, Illinois, August 28, 2013.

2

3

4  Certified Shorthand Reporter

5

6  C.S.R. Certificate No. 84-003836

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT 12**

1          UNITED STATES DISTRICT COURT
2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE
3
4    _____
5
     REBECCA COUSINEAU,                )
6                                       )
     individually on her own and       )
7                                       )
     on behalf of all others           )
8                                       )
     similarly situated,               )
9                                       )
             Plaintiff,                 )
10                                      )
         vs.                            ) No. 11-cv-01438-JCC
11                                      )
     MICROSOFT CORPORATION,            )
12                                      )
     a Delaware corporation,           )
13                                      )
     Defendants.                       )
14                                      )
                                        )
15   _____)
16        TELEPHONIC DEPOSITION OF NATHANIEL GOOD, PH.D.
17              San Francisco, California
18            Wednesday, August 28, 2013
19                    Volume I
20
21   Reported by:
     JOANNA BROADWELL
22   CSR No. 10959
23
24
25    Job No. CS1725698

1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4    _____

5

     REBECCA COUSINEAU,              )

6                                    )

     individually on her own and     )

7                                    )

     on behalf of all others        )

8                                    )

     similarly situated,            )

9                                    )

            Plaintiff,              )

10                                    )

         vs.                        ) No. 11-cv-01438-JCC

11                                    )

     MICROSOFT CORPORATION,          )

12                                    )

     a Delaware corporation,        )

13                                    )

            Defendants.             )

14                                    )

                                     )

15    _____)

16

17

18

19            Telephonic Deposition of NATHANIEL GOOD,

20    PH.D., Volume I, taken on behalf of Defendants, at 505

21    Montgomery Street, Suite 800, San Francisco,

22    California, beginning at 11:05 a.m. and ending

23    at 12:10 p.m. on Wednesday, August 28, 2013,

24    before JOANNA BROADWELL, Certified Shorthand

25    Reporter No. 10959.

```
1
2    APPEARANCES:
3
4    For Plaintiffs:
5        EDELSON, LLC
6        BY: RAFAY BALABANIAN (By telephone)
7            NICK LARRY (By telephone)
8        Attorneys at Law
9        35 North La Salle, 13th Floor
10       Chicago, Illinois 60654
11      (312) 589-6376
12       rbalabanian@edelson.com
13       nlarry@edelson.com
14
15   For Defendants:
16       DAVIS WRIGHT TREMAINE LLP
17       BY: STEPHEN M. RUMMAGE (By telephone)
18       Attorney at Law
19       505 Montgomery Street, Suite 800
20       San Francisco, California 94111
21       (206) 622-3150
22        steverummage@dwt.com
23
24
25
```

1                          INDEX

2    WITNESS                              EXAMINATION

3    NATHANIEL GOOD, PH.D.

4    Volume I

5                        BY MR. RUMMAGE                    5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    San Francisco, California, Wednesday, August 28, 2013

2                              11:05 a.m.

3

4    NATHANIEL GOOD, PH.D.,

5    having been administered an oath, was examined and

6    testified as follows:

7

8                              EXAMINATION

9    BY MR. RUMMAGE:

10       Q    Good morning, Dr. Good.

11            Could you please state your name and address for

12    the record.

13       A    Nathaniel Stanley Good, at 722 Gateview Avenue,

14    Albany, California, 94706.

15       Q    And you've provided an expert witness report in

16    connection with this matter that is Cousineau versus

17    Microsoft Corporation; correct?

18       A    Yes.

19       Q    Okay.  And I'm not going to go through your

20    background.  Your qualifications are accurately stated

21    in that report; correct?

22       A    Yes.

23       Q    And are you still employed by Good Research, LLC?

24       A    Yes.

25       Q    All right.  Did you receive a subpoena in advance

1    certification hearing," et cetera.

2            THE DEPONENT:  Oh, yes.  I --

3    BY MR. RUMMAGE:

4        Q    Sorry, it's the -- it's the paragraph right

5    underneath what we were just talking about.

6        A    Okay.  Got it.

7        Q    Okay.  Got it?  Good.

8            First of all, by the way, when -- when you

9    designed the survey, I take it you were designing it in

10   July of 2013, correct?

11       A    Yes.

12       Q    And you administered the survey in July of 2013;

13   is that right?

14       A    Yes, I think -- I believe so.

15       Q    Did you ask your users to focus on their behavior

16   in 2011?

17       A    I did not.

18       Q    Did you ask them to focus on their behavior

19   during any particular time period?

20       A    I did not.

21       Q    And were you asking users about their -- the

22   phones that they owned at the time they were taking the

23   survey or phones they had owned in the past?

24       A    This survey was geared towards people who had

25   smartphones now.

1    Q   Now?  All right.  And did it ask users whether
2    they had upgraded their smartphone software after its
3    initial purchase?
4    A   It did not.
5    Q   Okay.  So let me ask you a couple of questions
6    about the paragraph I just directed your attention to,
7    that is, the "Overview of Intended Testimony."
8    A   Yes.
9    Q   And I'm going to -- I'm going to read this into
10   the record, just so it's on the record and because you
11   and I aren't right there eyeballing each other, and make
12   sure we're on the same wavelength.
13       You say, "I will be prepared to testify,
14   primarily, that approximately 17.9 percent of users from
15   the survey stated that they, one, used their
16   smartphones' camera application to take pictures; two,
17   used Location Services on their smartphone; three,
18   discriminate between applications they permit to access
19   Location Services on their smartphones" --
20       THE REPORTER:  Sir, I'm sorry.  I missed one word
21   in there.
22       Sir, could you repeat it?  It's, "Three,
23   discriminate between applications they"...
24   BY MR. RUMMAGE:
25       Q   -- "permit to access Location Services on their

1  to turn off -- so in the scenario that you just

2  presented me, where they want to turn off camera access

3  to Location, I would say that they would say -- "Do you

4  allow your camera to use Location Services" -- I would

5  say, no, they wouldn't allow it.

6      Q   And that would be true regardless of whether they

7  turn off Location at the Master Settings level or at the

8  Application level, correct?

9      A   I think -- yeah, I think most consumers would

10  feel that if they were turning off a location, they were

11  turning off a -- a location.

12          Yeah.  I don't -- but we did ask them to explain

13  how they did it, so we could understand better how they

14  were setting it up, and in spot-checking these, it

15  looked like people had very specific means of turning

16  off their camera.

17      Q   Okay.  So I want to go to the data, if I could.

18      A   Yeah.

19      Q   I want to call up that spreadsheet that was

20  identified to me as Good 000043.

21      A   43?  Yes, I have it up.

22      Q   Okay.  And I assume you're really adept at Excel,

23  probably more adept than I am.

24      A   I --

25      Q   So I wonder if you could go to the data tab and

1   turn on the filters?

2       A    Okay.

3       Q    You know what I mean by that, right?

4       A    Yes.  I'm using it on a Mac, so it might be a

5   little different than yours, but --

6       Q    Okay.

7       A    -- I have the filters turned on.

8       Q    All right.  So why don't we go to Column (c),

9   which I believe is Question 20S --

10      A    Uh-huh.

11          THE REPORTER:  Question what?

12          THE DEPONENT:  Question 2OS.

13  BY MR. RUMMAGE:

14      Q    -- and why don't we deselect --

15      A    I'm sorry.

16          THE REPORTER:  "Why don't we select" what, sir?

17          MR. RUMMAGE:  Deselect --

18          THE REPORTER:  Sir, "Why don't we select" --

19          MR. RUMMAGE:  Why don't we -- I'm -- I

20  actually -- why don't we deselect, not select.

21  BY MR. RUMMAGE:

22      Q    Why don't we deselect "select all" and select

23  "Only Windows Mobile."

24          You with me?

25      A    Yes.

1    Q   And that should get us 38 of 1057 records found,

2    correct?

3    A   Yes.

4    Q   And so if we go to column (d), that then gives

5    you the operating system version, correct?

6    A   Yes.  This is the software reported version,

7    that's correct.

8    Q   And so I -- I checked the box for 7, and "Unsure,

9    Windows Phone 7."

10   Do you see that one?

11   A   Unsure Windows Phone 7.  Yes.

12   Q   And then I checked the box for Windows 7 and I

13   checked the box for Windows Phone 7.

14   A   Wait.  Hold on.

15   Almost done.  So you don't have -- so you have

16   "Unsure, Windows Phone 7, Windows 7," and then that's

17   it -- and then --

18   Q   Yeah, there's one near the bottom called "Windows

19   Phone 7"?

20   A   Yeah.  I see it.

21   Q   And then near the top, there's one that just

22   says, "7"?

23   A   7, near the top.  Yes.  Yes, I see it.

24   Q   So when I click on, "okay," after making those

25   selections, I find only four records.

1     A    Yes.

2     Q    Is that what you find as well?

3     A    I do.

4     Q    Okay.  So let me ask you:  Are these the only

5    four responses that you got for people who indicated

6    they had Windows Phone 7?

7     A    Yeah.  If they indicated they had Windows

8    Phone 7, this would be the only four.

9     Q    And if I were trying to ascertain the behavior of

10   Windows Phone 7 users, would you say that a sample of

11   four is going to give me, statistically, significant

12   results?

13    A    The -- the survey was looking at consumer

14   behavior with regards to privacy and, from that

15   perspective, I don't have any evidence that privacy

16   preferences would vary significantly between operating

17   systems.

18    Q    Do you have any evidence that privacy preferences

19   would be similar across operating system preferences?

20    A    Yeah.  I mean, from studies that we have done

21   previously we've seen that consumers tend to have

22   similar privacy preferences.

23         So, for example --

24    Q    What studies?  I'm sorry.  Go ahead.

25    A    If you look at work that's been done by Adrian

1    Felt, she's looked at smartphone privacy preferences for
2    Android and iPhones and -- let me see if I can get that
3    exact study.
4        I think it's called "Measuring User Confidence in
5    Smartphone Security and Privacy."
6    BY MR. RUMMAGE:
7        Q    And you said that was Android and iPhone users?
8        A    That's correct.
9        Q    Are you aware of any studies that include Windows
10   Phone users?
11       A    No, unfortunately, the market shares have been
12   really small.  It hasn't come up on -- on my radar.  I
13   haven't seen any studies.
14       Q    Okay.  All right.
15           MR. BALABANIAN:  It's -- your client's not is he?
16           THE REPORTER:  I'm sorry.  What was that, sir?
17           MR. BALABANIAN:  Your client's not in the room,
18   right?  I didn't want that to offend anybody.
19           MR. RUMMAGE:  No.
20           THE REPORTER:  Could you say that again, sir?
21   The -- please repeat the objection.
22           MR. BALABANIAN:  It's fine.  I didn't make an
23   objection.  I just asked him -- but it was -- it's fine
24   if it's off the record.
25           Go ahead.

BY MR. RUMMAGE:

Q   All right.  So I want to talk a little bit about the four lines where we have users who indicated that they have or may have Windows 7 as their operating system.

A   Okay.

Q   So the top line I have, when you look at the far left, appears to be Line 70; is that right?

A   That's correct.  That's the same with mine as well.

Q   All right.  Okay.  And so when I go to Column (d), that particular user says they're not actually sure what operating system they have, correct?

A   That's correct.

Q   All right.  And that user then says, after saying they're not sure what operating system they have, they answer, "yes," that they take photos, correct?

A   Yes.

Q   And then they say they have "always on" for their Location Services; is that right?

A   Yes.

Q   And "always on" means "I have Location Services on and leave it on for all applications."

Correct?

A   Yes.

1    Q   And that's the way it appeared to whoever filled

2   out that survey.  It said, "I have Location Services on

3   and leave it on for all applications," right?

4    A   That's correct.

5    Q   And, then, if you go to Question 6, which is in

6   Column (i) --

7    A   Uh-huh.

8    Q   -- it says, "No."

9        What does that mean?

10   A   Question 6, Column (i).

11       This indicates that the user has indicated they

12   don't allow the camera access to Location Services.

13   Q   How is that consistent with the answer that they

14   leave Location Services on for all applications, in

15   Question 5?

16   A   Well, Question 6 pertains specifically to the

17   camera.

18   Q   And what do you think Question 5 pertains to?

19   A   Question 5 deals with the Global Settings, and

20   for some operating systems, the ability to change per

21   location -- per application, where application could be

22   something that uses the camera but not specifically the

23   camera.

24       So -- so an application -- so, for example, a map

25   application allows you to have access to maps or a

1  photo-sharing application may allow you to have access

2  to the photo -- to the camera, but from the -- the

3  camera perspective, that -- that's -- that's a

4  different -- that's -- that's part of the hardware of

5  the phone.

6         It's not -- it's not specifically an application.

7         Maybe that's where the confusion's coming, is

8  that --

9  Q    I'm not confused as to --

10 A    Oh, okay.  I'm sorry.

11 Q    So on the second person who identified themselves

12 as using Windows Phone 7, this person says, "Windows 7."

13        I believe it's identified in the very first

14 column, at Line 328; is that right?

15 A    Yes.  I have 328 as well.

16 Q    And that person, in answer to Question 5,

17 indicates that they have turned off Location Services

18 for all applications?

19 A    Yes.

20 Q    Is that correct?

21 A    That's correct.

22 Q    And did -- would you understand that to mean that

23 they've turned it off at the master switch?

24 A    Yes.

25 Q    Okay.  And then Question 6 asks, "Do you allow

1    your camera to use Location Services on your smartphone,

2    yes or no?"

3         Do you see that?

4    A    Yes.

5    Q    And how did Line 28 answer that?

6    A    They said, "Yes."

7    Q    So, if I read this correctly, they said that they

8    don't allow Location Services for any applications.

9    Then they said they allow it for the camera; is that

10   right?

11        Am I reading that right?

12   A    Yeah.  I -- I think the way to understand that is

13   that they haven't specifically turned off Location for

14   the camera, that they -- they haven't gone through the

15   steps to specifically turn it off for the camera, in

16   respect to the camera location.

17        So they may allow applications, in general,

18   to use their phone and, therefore, they may not have set

19   it specifically for their camera.

20   Q    Okay.  So then Lines -- the next one I had down

21   is Line 451.

22        Is that right for you?

23   A    Yes.

24   Q    And that person, for their operating system

25   version, just says, "7," correct?

1    A    Says, "7," that's correct.

2    Q    And they say that -- for Location Services, that

3  they turn off Location Services for some applications,

4  for example, by leaving Location on for maps but off for

5  other applications, correct?

6    A    Yes.  That's correct.

7    Q    And I take it that by answering "sometimes," that

8  person is saying that sometimes that the master switch,

9  they've turned it off and sometimes they've turned it

10  on; is that right?

11    A    I've -- I'm not sure.  Yeah, and this -- it's

12  hard -- it's hard to interpret what a user would mean by

13  "sometimes," in that setting.

14    Q    So you mean they might interpret it that way but

15  they might not?

16        Is that what you're saying?

17    A    Let's see.  Did they provide an explanation?

18    Q    I read, in Column (g), "I need it when I have to

19  look for directions for my current location to another."

20    A    Yeah.  Yeah, that makes sense.

21    Q    What makes sense?

22    A    Oh, that they would turn it off for other

23  applications but they would leave it on for maps.

24    Q    And when you say, "turn it off," you mean at the

25  master switch?

1    A    The location, yeah.   It looks like they're
2    turning off the location.
3    Q    And then on Column (i), where it asks the
4    question of, "Do you allow the camera to use Location
5    Services," they say, "No," correct?
6    A    Yes.   They say, "No."
7    Q    And they say it was pre-set that way.
8         Am I reading that right?
9    A    That's correct.
10   Q    Do you know if that's accurate?
11   A    I don't.
12   Q    And then, finally, the last person who identified
13   themselves as using one Windows Phone 7 -- Line 727,
14   correct?
15   A    Yes.   727.
16   Q    And that person, in Column (f), says they don't
17   know what they do with Location Settings, correct?
18   A    Yes.
19   Q    And they don't know what they do with the camera,
20   correct?
21   A    That's correct.
22   Q    And those four are the only people in your survey
23   who said they used Windows Phone 7, right?
24   A    That's correct.
25   Q    Do you know, by the way, what Windows Phone 7.5

1      is?

2          A    Was it code-named Mango?  Was that -- that it?

3          Q    How about Mango?

4          A    Windows 7.5?

5               Yeah, I'm vaguely familiar with it.

6          Q    Okay.  Are you familiar with the updates to

7      Windows Phone 7 software?

8          A    I'm not familiar with all the details.

9          Q    Would you expect a user responding to your

10     survey, who had updated their Windows Phone 7 software

11     with new releases, to have identified their Windows

12     Phone software as 7?

13         A    I don't -- I don't know.

14         Q    Okay.  I -- just to be clear, when I looked at

15     the filters in (d), after selecting for people who chose

16     Windows Phone or Windows Mobile, I didn't see -- I guess

17     I saw -- take it back.

18              There was somebody who said Windows Phone 7.5,

19     correct?

20         A    Yeah.  Let's take a look at the filters again.

21              Yeah, there's one 7.5 there.  These --

22         Q    But only one, correct?

23         A    I think so.  Wait.  Let me take all the filters

24     off.  I'll just do a quick check.

25         Q    Yep.  Seems like it's Line 47.

1    A    That is what I -- did I see that as well?  Yeah,
2    47.
3    Q    And, by the way, that person responds that they
4    don't know where their Location Settings were and they
5    don't know whether they gave their phone access,
6    correct?
7    A    That's correct.
8    Q    Okay.  I just actually have a few more questions,
9    not too many, so if people were thinking they wanted a
10   break, let's just power through and see if we can finish
11   off real quick.
12        I think I'm done for now, with the data.
13   A    Okay.
14   Q    So I wanted to go back to your report, and I just
15   have a couple of more questions about the report.
16   A    Okay.  Can I -- can I close this Good 43, because
17   I got a lot of Windows up.
18        I just want to make sure I clear it out.
19   Q    Yeah.  I don't -- right now, don't think that I
20   need 43.
21   A    Okay.  Great.  Now we're going to the report?
22   Q    We are back to the report.
23   A    Okay.
24   Q    And I want to go to Page 4 of the report, if I
25   could.

1      A    Okay.  Okay.

2    BY MR. RUMMAGE:

3      Q    Okay.  So in the middle of that page, there's a

4    paragraph that begins, "Based on the above calculations

5    showing the total number," et cetera.

6           Do you see that paragraph?

7      A    I do.

8      Q    About four lines down, you say, "I estimate that

9    at least approximately 193,000 individuals fall within

10   the proposed definition of the class."

11     A    Uh-huh.

12     Q    Do you see that?

13     A    Yes.

14     Q    What is the "proposed definition of the class"

15   that you're referring to?

16          I didn't see that in your report?

17     A    Oh.  Really?  Okay.

18          It would be "The number of users who take photos

19   with their smartphones, sometimes turn off Location

20   Services for individual applications and do not allow

21   their camera to use the Location Services."

22   BY MR. RUMMAGE:

23     Q    Okay.  And where did you get that definition of

24   the class?

25     A    It's in the queries that I think I sent you.

1    It's the -- the last query.

2       Q    Okay.  So -- I see.  Where it says, "Number of

3    users who" --

4       A    Yes.

5       Q    -- "take photos with their smartphones."  Okay.

6       A    It's also --

7       Q    I see that now.

8       A    It's also in the Excel spreadsheet.

9            Let me find it for you.

10           Yeah.  If -- I think in one of the -- in Good

11   0042 Modified that I have, it's Good 41-number of users.

12      Q    Okay.  Hold on just a second, because that's

13   actually a spreadsheet we created, so let me pull that

14   up.

15      A    Oh, okay.  In the ones that I sent -- well, I'll

16   just let you pull that up.  I think all of the numbers

17   are the same.

18   BY MR. RUMMAGE:

19      Q    Okay.  So tell me where you were looking on Good

20   Modified, Good 42 Modified?

21      A    Yeah.  Good 41-number of users.

22      Q    Okay.  The last half?

23      A    Yeah.  Q4, "yes," Q5, "all locations sometimes,"

24   Q switch, "no."

25      Q    Oh, I see.  Okay.  All right.

1          Now, to go back to your testimony earlier, I just

2     want to make sure I understand it again, because I'm

3     looking, now, at the queries that you were describing.

4          A    Uh-huh.

5          Q    The second element of that number of users is

6     number of users who turn off Location Services for

7     individual applications, correct?

8          A    That's correct.

9          Q    Okay.  And I thought that we agreed earlier --

10    and I just want to confirm this -- that a user who turns

11    off Location Services at the setting level, before using

12    an application, is indistinguishable, for purposes of

13    that question, from a user who turns off or refuses the

14    use of Location Services at the application level,

15    correct?

16         A    Sorry.  Could you repeat that one more time?

17         Q    Yes.  I thought we agreed earlier that for

18    purposes of that question, that is, "Do you sometimes,

19    always, never allow Location Services," that in

20    responding to that question with the answer "sometimes,"

21    you can't tell whether the user is saying, "I sometimes

22    turn off Location Services at the Settings level" or

23    whether the user is saying, "I sometimes turn off

24    Location Services at the Application level"?

25         A    At the -- you said the -- the -- the

1  distinguisher there was Settings and Application?

2      Q    Correct.

3      A    So Setting would be -- can you -- can you

4  describe what you mean by "setting"?

5      Q    Again, I go back to -- have you ever used a

6  Windows Phone 7?

7      A    I have not.

8      Q    Have you ever looked at the User Interface?

9      A    Just the documents that are provided to me.

10     Q    What documents were provided to you, that had the

11 User Interface?

12     A    Sami's report.

13     Q    All right.  So you don't know how a user would

14 change Location Services at the Settings level?

15         MR. BALABANIAN:  Objection, asked -- you can

16 answer it, if you understand.

17         THE DEPONENT:  So my understanding is that there

18 was a master location switch.

19         Is that what you're referring to in the Setting

20 level?

21 BY MR. RUMMAGE:

22     Q    Well, that's -- it's in the Settings --

23     A    Yeah, the Settings -- okay.

24     Q    -- portion of the Windows Phone 7.  Yes.

25     A    Okay.  And --

1    Q    So are you more comfortable if I refer to it that

2    way, as distinct from saying, "at the Settings level"?

3    A    No, that's okay, now that I understand what you

4    mean by "Settings level."  That's fine.  And --

5    Q    So to go back to my question --

6    A    Sure.

7    Q    -- do you have the question in mind?

8    A    If you could repeat it, that would be great.

9    Thank you.

10    Q    You know, if the court reporter can find it

11    easily, that would probably be best.

12    A    Okay.

13         THE REPORTER:  I will.  Hold on one moment.

14         THE DEPONENT:  Sure.

15                   (The record was read back by

16                   the reporter as follows:)

17                   "Q.  Yes.  I thought we agreed earlier

18                   that for purposes of that question, that

19                   is, "Do you sometimes, always, never

20                   allow Location Services," that in

21                   responding to that question with the

22                   answer "sometimes," you can't tell

23                   whether the user is saying, "I sometimes

24                   turn off Location Services at the

25                   Settings level" or whether the user is

1        saying, "I sometimes turn off Location

2        Services at the Application level"?

3            THE DEPONENT:  Oh, okay.  It -- my understanding

4   is in the Windows Mobile phone, there is no Application

5   level settings; is that -- is that correct?

6   BY MR. RUMMAGE:

7       Q    Your understanding is what's important here, in

8   what you designed --

9       A    Okay.

10      Q    -- and how you designed the survey.

11           Was that your understanding, as you designed the

12  survey?

13      A    Yeah.  My understanding is that if a user who had

14  Windows Mobile was adjusting their settings, then that

15  would be -- then they would say, "sometimes," because

16  they were sometimes turning them off and then sometimes

17  turning them on, in the -- in the Settings level.

18      Q    Okay.

19      A    I mean --

20      Q    Okay.

21      A    -- all of these operating systems operate a

22  little differently, and so in -- in a Windows setting,

23  that's my understanding of how it would work.

24      Q    Okay.  You, at the end of your report, talk about

25  your being compensated at the rate of $350 per hour for

1   your time on this case.

2        How much time have you spent on the case?

3   A   Let me find out.  Not including today --

4   Q   Oh, I'm just looking for a ballpark, Mr. --

5   A   Oh, okay.

6   Q   -- Dr. Good.  You don't need to be specific.

7   A   Thank you.  Around 20 hours.

8   Q   Okay.  Let me just look over my outline real

9   quick, but I believe I'm done.

10       Oh, are you familiar with the Stored

11  Communications Act, Dr. Good?

12       THE REPORTER:  I'm sorry.  With the what?

13       MR. RUMMAGE:  Stored, S-T-O-R-E-D, Communications

14  Act.

15       THE DEPONENT:  I'm not.

16  BY MR. RUMMAGE:

17  Q   Okay.  I don't have -- actually, I do have one

18  other question.

19       Is there any particular reason why you did not

20  design the survey so that it captured only Windows

21  Phone 7 research?

22  A   It -- it's difficult to get -- well, Windows

23  Mobile Phone 7 stopped being widely deployed back in

24  2011, so it would be difficult to have people recall

25  what they were doing back -- memory studies generally

1  aren't very good; they're not very reliable.

2          Also, the market share is -- is very low, and so

3  it's -- it's difficult to get a large number of those --

4  those users.

5          MR. RUMMAGE:  I have nothing further.

6          MR. BALABANIAN:  I have no questions.

7          We'll reserve signature.

8          MR. RUMMAGE:  And --

9          MR. BALABANIAN:  Steve, I want to thank you for

10 allowing us to do this by telephone.  Thanks for

11 accommodating us.

12          THE DEPONENT:  Yeah, thank you so much.

13

14              (TIME NOTED: 12:10 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1    I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken before

4    me at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were placed under oath; that a verbatim

7    record of the proceedings was made by me using machine

8    shorthand which was thereafter transcribed under my

9    direction; further, that the foregoing is an accurate

10   transcription thereof.

11       I further certify that I am neither financially

12   interested in the action nor a relative or employee of

13   any attorney or any of the parties.

14       IN WITNESS WHEREOF, I have this date subscribed

15   my name.

16

17   Dated: 9/3/2013

18   _____

19                          JOANNA BROADWELL

20                          CSR NO. 10959

21

22

23

24

25

# EXHIBIT 13

| | |
|---|---|
| **From:** | Ben Thomassen <bthomassen@edelson.com> |
| **Sent:** | Thursday, July 25, 2013 3:41 PM |
| **To:** | Rummage, Steve |
| **Cc:** | Burnside, Fred; Chandler Givens; Rafey Balabanian; Bugaighis, Zana |
| **Subject:** | Re: Cousineau v. Microsoft |

Steve:

Per our call, we're planning on moving for certification of the following class: **All WM7 Users in the United States who denied the Camera Application access to their location information, and then used the Camera Application with the Master Location Switch turned "On."** As discussed, we were planning on amending, but if you don't anticipate making arguments about the slight mismatch with the operative complaint, then there's no real need to generate more work for everyone.

We'll get you potential expert deposition dates as soon as we're able.

Thanks,
Ben

On Thu, Jul 25, 2013 at 12:01 PM, Rummage, Steve <SteveRummage@dwt.com> wrote:

Yes.  I'll call you then.

**Steve Rummage** | Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8136 | Fax: (206) 757-7136
Email: steverummage@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**From:** Ben Thomassen [mailto:bthomassen@edelson.com]
**Sent:** Thursday, July 25, 2013 9:45 AM

**To:** Rummage, Steve
**Cc:** Burnside, Fred; Chandler Givens; Rafey Balabanian; Bugaighis, Zana
**Subject:** Re: Cousineau v. Microsoft

Steve:

My afternoon meeting just got moved back an hour, so I'm a bit more available now.  If it works on your end, can we aim for 4:30 CT?


Thanks,

Ben


On Tue, Jul 23, 2013 at 4:39 PM, Ben Thomassen <bthomassen@edelson.com> wrote:

Great, talk to you then.


On Tue, Jul 23, 2013 at 4:28 PM, Rummage, Steve <SteveRummage@dwt.com> wrote:

OK.  I'll call you at 2:45 my time.  (You understand I'll have only 15 minutes at that point.  Depending on what you want to discuss, that may be plenty.)


**Steve Rummage** | Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8136 | Fax: (206) 757-7136
Email: steverummage@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.


**From**: Ben Thomassen [mailto:bthomassen@edelson.com]
**Sent**: Tuesday, July 23, 2013 2:14 PM


**To:** Rummage, Steve
**Cc:** Burnside, Fred; Chandler Givens; Rafey Balabanian; Bugaighis, Zana

**Subject:** Re: Cousineau v. Microsoft


Makes sense.  Let's do 4:45 PM CT on Thursday.

On Tue, Jul 23, 2013 at 3:12 PM, Rummage, Steve <SteveRummage@dwt.com> wrote:

Thanks, Ben.  It's on my calendar.

But it occurs to me that it would be better to do this Thursday.  My client will be out of the office for two weeks starting Friday morning, and so if you want our consent to something (like a revised class definition), we'll need to tee it up Thursday.  Does that make sense?

I'm available between 3:00 and 5:00 your time, if that makes sense to you.  My apologies for not thinking of this from the outset.

Regards, Steve.

**Steve Rummage** | Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8136 | Fax: (206) 757-7136
Email: steverummage@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**From**: Ben Thomassen [mailto:bthomassen@edelson.com]
**Sent**: Tuesday, July 23, 2013 11:47 AM

**To:** Rummage, Steve
**Cc:** Burnside, Fred; Chandler Givens; Rafey Balabanian; Bugaighis, Zana

**Subject:** Re: Cousineau v. Microsoft

Great --- how about 12:00 PM CT on Friday?

On Tue, Jul 23, 2013 at 1:02 AM, Rummage, Steve <SteveRummage@dwt.com> wrote:

I'm around.  Best if you propose a time to chat.  Thursday is sort of tight, but Friday is pretty open for me.

**Steve Rummage** | Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8136 | Fax: (206) 757-7136
Email: steverummage@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**From:** Ben Thomassen [mailto:bthomassen@edelson.com]
**Sent:** Monday, July 22, 2013 6:51 PM
**To:** Rummage, Steve
**Cc:** Burnside, Fred; Chandler Givens; Rafey Balabanian; Bugaighis, Zana
**Subject:** Cousineau v. Microsoft

Steve:

As you know, our class certification motion is due next Monday. Before then, we'll need to confer with you about a couple of things --- namely, our need to amend (only to update the class definition in line with what we've learned through discovery) and, we assume, move the court to file documents under seal that Microsoft has designated as confidential.

We'll be ready to talk towards the end of this week, but I wanted to ping you now to give you a heads-up and check on your availability. Can you let me know whether / when you'd be available on Thursday or Friday to discuss?

Thanks,

Ben

--

Ben Thomassen | Edelson LLC

350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
1.312.572.7208 (direct) | 1.312.264.0351 (fax)
bthomassen@edelson.com | www.edelson.com

♲ Please consider the environment before printing this e-mail

# EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CE DESIGN LTD., an Illinois corporation, )
individually and as the representative of a )
class of similarly-situated persons, )
                                     )    Case No.  07 C 3340
                Plaintiff, )
v. )    Judge William J. Hibbler
                                     )
BEATY CONSTRUCTION, INC., )
                                     )
                Defendant. )

**PLAINTIFF'S AGREED MOTION FOR DECERTIFICATION OF CERTIFIED**
**CLASS AND DISMISSAL OF PLAINTIFF'S INDIVIDUAL CLAIMS PURSUANT**
**TO SETTLEMENT AGREEMENT OF THE PARTIES**

NOW COMES plaintiff, CE DESIGN, LTD, by and through its attorneys, and pursuant to Federal Rule of Civil Procedure 23(c)(1)(C) and 23(e), moves the Court for an order (a) decertifying the certified class without requiring any form of notice to absent class members and vacating the Class Certification Opinion (Doc. 59), and (b) dismissing Plaintiff's individual claims with prejudice, pursuant to the agreement of the parties.  In support thereof, Plaintiff states as follows:

1.    Plaintiff filed this action on behalf of itself and a putative class of persons, alleging that Defendant had sent them unsolicited facsimile advertisements in violation of the Telephone Consumer Protection Act ("TCPA"). Defendant denied Plaintiff's allegations.

2.    Plaintiff moved for class certification.  Plaintiff contended that the class had 2,257 members, distributed throughout many states, but Plaintiff had been unable to locate a list of class members in discovery.

3. Defendant opposed certification of the class for several reasons, including an argument that the list of targeted businesses had been destroyed. Opinion, p. 4.

4. On January 28, 2009, the Court certified the following class:

All persons who, in August 2003, were sent a fax from Beaty Construction, Inc., stating, "Hardwood Crane Mats Used 1 Time Description 16' X 4' X 8 with cutouts" for $2300.00 each F.O.B. Lafayette, Indiana" and listing 317-835-2254 as the telephone number to call for information.

5. In its Class Certification Opinion, the Court explained that it was "well aware that CE Design's efforts to locate potential class members may come up short. Should this occur, Beaty Construction's remedy is to file a motion decertify the class." Opinion, 18. The Court noted that class members would "have to represent to the Court—via affidavit and under the penalty of perjury—that they received the fax in question on the dates in issue." Opinion, p. 6. The Court also noted that, "if CE Design is unable to locate enough businesses willing to join this litigation, the Court will have no qualms in granting a motion to decertify the class." Opinion, p. 7.

6. Since the Class Certification Opinion, Plaintiff has taken three additional depositions—a third-party computer services vendor, one of Defendant's current employees, and one of Defendant's former employees—but has been unable to locate any records identifying any other member of the class. No one employed by Defendant can recall how the list of targeted businesses was created and no one can find the data in Defendant's computers. Consequently, Plaintiff cannot satisfy the Court's requirement to

provide affidavits from other persons to which Defendant's junk faxes were sent.

7.      Defendant filed a petition for leave to appeal pursuant to Rule 23(f), which the Court of Appeals granted.  The appeal will be mooted by the granting of this motion, because the parties have agreed to settle this matter.

8.      Additionally, Defendant filed a motion before this Court to decertify the class.  Doc. 69.  That motion is still pending and will be mooted by the granting of this motion.

9.      Prior to briefing on the appeal, the Court of Appeals ordered Plaintiff and Defendant to attend mandatory mediation before Mr. Rocco J. Spagna of the Seventh Circuit's Settlement Conference Office.  In mediation, the parties could not reach agreement upon any class-wide relief.  Through Mr. Spagna's efforts, the parties have agreed upon an individual settlement, however, contingent upon decertification of the class and dismissal of Plaintiff's individual claims with prejudice.

10.     For those reasons, Plaintiff agrees that the class should be decertified.

11.     The parties have agreed to settle Plaintiff's claims only for the total amount of $5,000, which will compensate Plaintiff and reimburse some of Plaintiff's attorneys' expenses.  The settlement will not bind any absent class member and, therefore, requires no form of notice to unknown class members.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order (a) decertifying the class the Court certified on January 26,

2009, without requiring any form of notice to absent class members, and

vacating the Class Certification Opinion (Doc. 59), and (b) dismissing the

lawsuit individually, with prejudice and without taxable costs.

October 12, 2009.                                  Respectfully submitted,


                                                   /s  Phillip A. Bock
                                                   One of Plaintiff's attorneys

Brian J. Wanca                     Phillip A. Bock
Ryan M. Kelly                      Tod A. Lewis
ANDERSON + WANCA                   BOCK & HATCH, LLC
3701 Algonquin Road, Suite 760     134 N. La Salle St., Suite 1000
Rolling Meadows, IL  60008         Chicago, IL  60602
Telephone:  847/368-1500           Telephone:  312/658-5500

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.3**
**Eastern Division**

CE Design Ltd.

                    Plaintiff,

v.                                   Case No.: 1:07–cv–03340
                                   Honorable William J. Hibbler

Beaty Contruction, Inc.

                    Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 21, 2009:

      MINUTE entry before the Honorable William J. Hibbler: Plaintiff's Agreed Motion for decertification of certified class and dismissal of plaintiff's individual claims pursuant to settlement agreement of the parties [74] is granted. All pending motions and dates are terminated as moot. Civil case terminated. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.